PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 10/7/96**

TENTH CIRCUIT

---

| | |
|---|---|
| M. RAY PAINTER, DR., as named plaintiff on behalf of all those persons similarly situated, | |
| Plaintiff - Appellant, | |
| v. | No. 95-1331 |
| DONNA E. SHALALA, Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, | |
| Defendants- Appellees, | |
| THE COLORADO MEDICAL SOCIETY, | |
| Amicus Curiae. | |

---

Appeal from United States District Court
for the District of Colorado
(D.C. No. 93-S-1241)

---

Martin J. Katz (Daniel E.D. Friesen with him on the brief), of Davis, Graham & Stubbs, L.L.C., Denver, Colorado, for the appellant.

Stephanie R. Marcus (Anthony J. Steinmeyer with her on the brief), of the Department of Justice, Washington, D.C., for the appellees.

William H. ReMine and Robert R. Montgomery, of Montgomery, Little & McGrew, P.C., Englewood, Colorado, for the amicus curiae The Colorado Medical Society.

---

Before HENRY, LOGAN, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Plaintiff M. Ray Painter, M.D., filed this action for injunctive, mandamus, and declaratory relief against defendants United States Department of Health and Human Services (HHS), and Donna Shalala, Secretary of HHS (the Secretary), arising out of defendants' alleged failure to comply with certain budget neutrality provisions of the Medicare Act. The district court dismissed the action for lack of subject matter jurisdiction. We affirm.

I.

*A. The Medicare Part B payment scheme*

Medicare, the federal medical insurance program for the aged and disabled, is composed of two parts--A and B. Part A provides hospital insurance benefits, and is funded from social security taxes. See 42 U.S.C. §§ 1395c-1395i-4. Part B, which is at issue in this case, is a voluntary program that provides Medicare beneficiaries with supplemental medical insurance benefits for physicians' and other health care services. See id. at §§ 1395j-1395w-4. Funding for Part B is derived from monthly premiums paid by beneficiaries, as well as from federal government contributions. By statute, HHS is responsible for administering the program, and it contracts with private insurance carriers to perform certain administrative functions on behalf of the Secretary. See id. at § 1395u. These functions include evaluation and payment of Part B claims. See id.

Prior to 1992, the payment amount for Part B claims was the lesser of (1) the physician's actual charge; (2) the physician's customary charge; or (3) the prevailing

charge in the locality for similar services.  See 42 U.S.C. § 1395(a) (1988).  Effective January 1, 1992, Congress revised the method for calculating the payment amount for Part B claims for physicians' services to the lesser of (1) the physician's actual charge; or (2) an amount determined pursuant to a fee schedule set by the Secretary.  42 U.S.C. § 1395w-4(a).  Under the fee schedule, the payment amount is calculated by multiplying three factors: (1) the relative value for the service; (2) the conversion factor; and (3) the geographic adjustment factor.  42 U.S.C. § 1395w-4(b)(1).

The three factors utilized in determining the payment amount are all established by the Secretary.  Only the conversion factor is at issue in this case.  In 1991, the Secretary was directed by Congress, in what is referred to by the parties as the "budget neutrality" provision, to set the initial value for the conversion factor in such a manner that, "if [the new payment scheme] were to apply during 1991 using such conversion factor, [it] would result in the same aggregate amount of payments . . . for physicians' services as the estimated aggregate amount of the payments . . . for such services in 1991."  42 U.S.C. § 1395w-4(d)(1)(B).

Once established, the conversion factor must be annually updated.  "Not later than April 15 of each year . . . the Secretary [is required to] transmit to the Congress a report that includes a recommendation on the appropriate update . . . in the conversion factor . . . for all physicians' services . . . in the following year."  42 U.S.C. § 1395w-4(d)(2)(A).  In making the annual recommendation, the Secretary is required to consider, among other things, "the percentage by which actual expenditures for all physicians' services and for the services involved under [Part B] for the fiscal year ending in the year preceding the year in which such recommendation is made were greater or less than actual expenditures

for such services in the fiscal year ending in the second preceding year." 42 U.S.C. § 1395w-4(d)(2)(A)(ii). The Secretary is also required to include in the annual recommendation "a statement of the percentage by which (I) the actual expenditures for physicians' services under [Part B] (during the fiscal year ending in the preceding year . . .) . . . exceeded, or was less than (II) the expenditures projected for the fiscal year." 42 U.S.C. § 1395w-4(d)(2)(i).

By May 15 of each year, the Physician Payment Review Commission (PPRC) is required to review the Secretary's recommendation and submit to Congress its own report, "including its recommendations respecting the update . . . in the conversion factor . . . for the following year." 42 U.S.C. § 1395w-4(d)(2)(F). Thereafter, "[u]nless Congress otherwise provides, . . . the update for a year is equal to the Secretary's estimate of the percentage increase in the appropriate update index . . . for the year." 42 U.S.C. § 1395w-4(d)(3)(A)(i).

Once the annual update is established, the Secretary is required "to have published in the Federal Register, during the last 15 days of October . . . , the conversion factor . . . which will apply to physicians' services for the following year and the update . . . determined . . . for such year." 42 U.S.C. § 1395w-4(d)(1)(C)(ii). Prior to January 1 of each year, the Secretary is also required to send an updated fee schedule, including the conversion factor, to each physician providing Medicare Part B services (including both participating and non-participating physicians). 42 U.S.C. §§ 1395w-4(b)(1), 1394w-4(h). The fee schedule is transmitted to physicians in conjunction with notices relating to the participating physician program under 42 U.S.C. § 1395u(h). See 42 U.S.C. § 1395w-4(h). Accordingly, physicians have the right to review the fee schedule for a given year

-4-

and decide whether to be participating or non-participating physicians.

### B. Participating and non-participating physicians

The following information is taken directly from the Sixth Circuit's opinion in

American Academy of Ophthalmology v. Sullivan, 998 F.2d 377 (6th Cir. 1993), and is

applicable to the new Medicare Part B payment scheme at issue in this case:

> Physicians have two options for receiving payment for the services they provide to Medicare beneficiaries. A physician may accept the beneficiary's assignment of Medicare benefits, in which case the physician agrees to accept the established Medicare fee schedule amount as full payment for all covered services provided to Medicare beneficiaries. Medicare, through the local carrier, directly pays the physician 80% of the fee schedule amount. The beneficiary is required to pay the remaining 20% (the coinsurance amount). Beneficiaries must also pay an annual deductible of $100.
>
> Alternatively, a physician may decline to accept assignment. In such cases, Medicare pays 80% of the fee schedule amount, and the beneficiary pays the coinsurance amount plus any difference between the physician's charge and the fee schedule amount.
>
> Physicians have two options when dealing with the Medicare program. A physician may become a "participating physician," in which case the physician agrees to accept assignment of Medicare benefits for all Part B services that the physician provides. 42 U.S.C. § 1395u(h). Alternatively, a physician may decline to become a "participating physician," in which case the physician may accept or decline the assignment of Medicare benefits on a case-by-case basis.

Id. at 379.[1]

### C. Preclusion of judicial review of conversion factor

With the adoption of the new Part B payment scheme, Congress enacted a

provision barring administrative and judicial review of the Secretary's determinations in

establishing the fee schedule. 42 U.S.C. § 1395w-4(i)(1). Specifically, this "no review"

---

[1] The amended complaint in this case does not indicate whether plaintiff was a participating or non-participating physician for 1992. However, from the face of the complaint, it is apparent that plaintiff chose to treat Medicare Part B patients during 1992.

provision states:

> There shall be no administrative or judicial review under section 1395ff of this title or otherwise of--
> (A) the determination of the adjusted historical payment basis . . . ,
> (B) the determination of relative values and relative value units . . . ,
> (C) *the determination of conversion factors . . . ,*
> (D) the establishment of geographic adjustment factors . . . , and
> (E) the establishment of the system for the coding of physicians' services.

Id. (emphasis added).

### D.  Plaintiff's complaint

Plaintiff filed this proposed class action pursuant to 28 U.S.C. § 1331 alleging the Secretary violated 42 U.S.C. § 1395w-4(d)(1)(B), the budget neutrality provision. Append. at 1-2.  More specifically, plaintiff alleged that, "[o]n information and belief, the budget neutrality provision has been violated by the defendants because the aggregate amount of payments for physicians' services, by applying the 1992 conversion factor during 1991, would not have resulted in the same aggregate amount of payments as the estimated aggregate amount of payments for such services in 1991." Id. at 4.  In his appellate brief, plaintiff expands upon these allegations and asserts that, in establishing the 1992 conversion factor, the Secretary erroneously concluded if the new payment system had been in effect during 1991, the volume of certain services would have varied from those actually rendered under the old payment system.  Accordingly, plaintiff asserts, the Secretary erroneously and unnecessarily reduced the amount of the conversion factor for 1992, thereby reducing aggregate spending under the new payment system. Plaintiff further asserts that, when the new payment system was implemented in 1992, the volume offsets predicted by the Secretary did not occur, thereby demonstrating the 1992 conversion factor was erroneously calculated.  Based upon these allegations, plaintiff

requests an order requiring defendant to comply with the budget neutrality provision, an order requiring defendant to pay all claims made by physicians in 1992 in the amounts required by the budget neutrality provision of Medicare Part B, "such amounts to be paid into a common fund for disbursement to those physicians," and corresponding declaratory relief. Id. at 4-5.

*E.  Proceedings in the district court*

Defendants responded to plaintiff's complaint by filing a motion to dismiss for lack of subject matter jurisdiction. After allowing the parties to brief the matter, and after hearing oral argument, the district court granted defendants' motion to dismiss.

## II.

We review de novo a district court's dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). See Urban v. Jefferson County School Dist. R-1, 89 F.3d 720, 724 (10th Cir. 1996).

## III.

*A.      Does the "no-review" provision of the Medicare Act, 42 U.S.C. § 1395w-4(i)(1)(C), bar judicial review of plaintiff's claim?*

Defendants argued, and the district court agreed, that plaintiff's claim was barred by the "no review" provision of the Medicare Act, 42 U.S.C. § 1395w-4(i)(1)(C). On appeal, plaintiff contends § 1395w-4(i)(1)(C) does not bar his claim because there is a strong presumption in favor of judicial review, there is no indication that Congress intended to preclude review "of the lawless agency action at issue here," and the structure of the Medicare Act supports a limited reading of the no-review provision.

As noted by plaintiff, there is a "strong presumption that Congress intends judicial review of administrative action." Bowen v. Michigan Academy of Family Physicians,

476 U.S. 667, 670 (1986). However, this presumption may be overcome by "'specific language or specific legislative history that is a reliable indicator of congressional intent,'" id. at 673 (quoting Block v. Community Nutrition Institute, 467 U.S. 340, 349 (1984)), or where congressional intent to preclude judicial review is "'fairly discernible' in the detail of the legislative scheme." Id. (quoting Block, 467 U.S. at 351).

In this case, we conclude the language of the "no review" provision clearly indicates Congress' intent to preclude administrative and judicial review of the manner in which the conversion factor is calculated by the Secretary. In no uncertain terms, § 1395w-4(i)(1)(C) provides that "[t]here shall be no administrative or judicial review under section 1395ff of this title or otherwise of . . . the determination of conversion factors." We can think of little that Congress could have said to make the plain and unambiguous language of the statute, and its corresponding intent, more clear.

In addition, we conclude that inferences of congressional intent may be drawn from the overall structure of the new Part B payment scheme. Under the amendments to the Medicare Act, the Secretary was instructed to set the conversion factor so that, if the new payment scheme were applied in 1991, the total amount of Part B payments would be the same as under the old payment scheme. 42 U.S.C. § 1395w-4(d)(1)(B). To carry out this task, which had to be completed before the end of 1991, the Secretary had to estimate what the total Part B payments would be for 1991 under the old (i.e., the then-existing) payment scheme, and then set the conversion factor in such a manner that, if applied in 1991, the new payment scheme would result in total payments equivalent to those made under the old payment scheme. Obviously, both of these tasks were "best guesses" on the part of the Secretary. Notably, however, Congress did not include any mechanism in the

Medicare Act for the Secretary to recalculate the 1992 conversion factor after the actual data for 1991 or 1992 was available. Instead, the new statutory scheme requires the Secretary to submit to Congress, on an annual basis, recommendations concerning necessary updates to the conversion factor. The Secretary's recommendations are reviewed by the PPRC, which in turn submits its own report to Congress. Congress can then either adopt or reject the recommendations of the Secretary and the PPRC. Based upon this scheme, we believe it is fair to conclude that Congress intended that the Secretary would take her "best shot" at establishing the conversion factor for 1992, that the conversion factor would be annually updated in an effort to correct for any errors in the Secretary's initial estimates, and that review of the conversion factor would be reserved solely for Congress.

For these reasons, we conclude the presumption favoring judicial review of administrative action has been overcome in this case, and plaintiff is barred by § 1395w-4(i)(1)(C) from pursuing his claim.[2]

> **B.** *Does the "no-review" provision, 42 U.S.C. § 1395w-4(i)(1)(C), violate plaintiff's due process rights?*

In an attempt to bypass the "no review" provision, plaintiff argues he has a constitutional right to challenge the Secretary's computation of the conversion factor, and any preclusion of that right would violate his due process rights. In support of this argument, plaintiff asserts he has a vested property right in receiving Part B payments derived from a conversion factor that is calculated in the precise manner directed by

---

[2] In light of this conclusion, we find it unnecessary to address defendants' argument that 42 U.S.C. § 405(h) also precludes us from exercising jurisdiction over plaintiff's claim.

Congress, and budget neutral, when viewed retrospectively. Plaintiff further asserts the Secretary's alleged erroneous computation of the conversion factor, and its necessary effect on the computation of Part B payments, has deprived him of that property right.

In order to establish entitlement to procedural due process, a plaintiff must demonstrate a property or liberty interest in the benefit for which protection is sought. Morrissey v. Brewer, 408 U.S. 471, 480-81 (1972); Doyle v. Oklahoma Bar Ass'n, 998 F.2d 1559, 1569 (10th Cir. 1993). For due process purposes, a property interest must be specific and presently enforceable. Doyle, 998 F.2d at 1569. "[A] legitimate claim of entitlement is created only when the statutes or regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing." Eidson v. Pierce, 745 F.2d 453, 459-60 (7th Cir.1984). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents of State College v. Roth, 408 U.S. 564, 577 (1972).

To date, no federal court has decided whether a physician who provides Medicare Part B services has any type of property interest in receiving payment for those services. However, several cases from the Second Circuit, all of which involved state Medicaid providers, suggest some form of property interest may exist under these circumstances. See Tekkno Laboratories v. Perales, 933 F.2d 1093, 1099 (2d Cir. 1991) (concurring opinion) (suggesting Medicaid provider has constitutionally protected property interest in reimbursement for Medicaid services already performed); Oberlander v. Perales, 740 F.2d 116, 120 (2d Cir. 1984) (New York law recognizes property interest in money paid for

medical services already performed in reliance on duly promulgated reimbursement rate); but see Yorktown Medical Laboratory v. Perales, 948 F.2d 84, 89 (2d Cir. 1991) (holding Medicaid provider did not have property interest subject to due process protections in payments for claims that were pending investigation under Medicaid Act or New York Department of Social Service regulations). Assuming, without deciding, that physicians have a property interest in receiving payment for Part B services rendered, this case requires us to decide the narrower question of whether those physicians have a legitimate property interest in having their reimbursement payments calculated in a particular manner.

To answer this question, we return to the structure of the new Part B payment system. As previously noted, the Secretary was charged with initially establishing the conversion factor for 1992. 42 U.S.C. § 1395w-4(d)(1)(B). Thereafter, she was (and still is) required to submit to Congress an annual recommendation for updating the conversion factor. 42 U.S.C. § 1395w-4(d)(2)(A). The Secretary is also charged with sending updated fee schedules to physicians prior to the beginning of each calendar year. 42 U.S.C. § 1395w-4(b)(1) and (h). This "fee notification" process, which is done in conjunction with the participating/non-participating physician program, allows physicians to see ahead of time what Medicare will pay for particular services, to decide whether to become a participating or non-participating physician for a particular year, and to decide whether to treat Medicare patients at all during a particular year.

In light of this statutory framework, we conclude plaintiff does not have a property interest in receiving Part B payments in an amount different from that set forth in the Secretary's 1992 fee schedule. In late 1991, plaintiff presumably received a copy of the

-11-

Part B fee schedule for 1992, and was therefore fully aware of the amount he would receive from Medicare Part B for services rendered.[3] Had he chosen to do so, he could have refused to provide services to any Medicare patients during 1992. However, he obviously chose otherwise and provided Medicare Part B services to patients. Although he may have a recognizable property interest in receiving payment in accordance with the fee schedule established for 1992, there is nothing in the Medicare Act which would have led a reasonable physician to believe he might be entitled to a greater payment amount for a particular service than was outlined in the Secretary's fee schedule. Nor is there anything in the Medicare Act that would have led a reasonable physician to believe the conversion factor for a given year would be recalculated at a later date to correct for errors in volume estimates, or that Part B payments would be recalculated and supplemented if necessary.

Because plaintiff has failed to demonstrate a legitimate property interest in having his reimbursement payments calculated in a specific manner, we reject his assertion that the "no review" provision of the Medicare Act violates his due process rights.

C.      *Are the Secretary's actions reviewable under the ultra vires doctrine?*

In a second effort to bypass the "no review" provision, plaintiff asserts we have jurisdiction over this action because the Secretary acted beyond the scope of authority in establishing the 1992 conversion factor. More specifically, plaintiff asserts the Secretary's actions were ultra vires because volume offsets were considered in

---

[3] We note that there is nothing in the amended complaint suggesting that plaintiff did not receive a copy of the 1992 Part B fee schedule. Even assuming that plaintiff did not receive a 1992 fee schedule, we conclude that he has not established a recognizable property right.

establishing the 1992 conversion factor, even though Congress rejected a version of the revised Medicare Act that expressly authorized consideration of such offsets.

The ultra vires doctrine "excepts from the Eleventh Amendment bar suits against officers acting in their official capacities but without any statutory authority, even though the relief would operate against the State." Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 114 n. 25 (1984). Likewise, the ultra vires doctrine allows a plaintiff to overcome the doctrine of federal sovereign immunity where it is alleged a federal officer has acted outside of his or her authority. See Maryland Dept. of Human Resources v. Department of Health and Human Services, 763 F.2d 1441, 1448 (D.C.Cir. 1985). An ultra vires claim rests on "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." Larson v. Domestic & Foreign Commerce Corporation, 337 U.S. 682, 690 (1949).

We conclude the ultra vires doctrine is inapplicable for several reasons. First, we find nothing in the revised Medicare Act to support plaintiff's assertion that the Secretary lacked the power to consider volume offsets in establishing the conversion factor. Although Congress may have considered and rejected versions of the Medicare Act that expressly authorized consideration of volume offsets, the important fact is the enacted version does not expressly prohibit consideration of such offsets. Because we may presume Congress knew how to preclude consideration of such offsets had it so desired, its failure to do so is telling. See United States v. Yermian, 468 U.S. 63, 73 (1984). Second, unlike cases that have been held to fall within the ultra vires doctrine, we could not dispose of plaintiff's challenge to the validity of the calculation procedure based simply upon the pleadings. See Oestereich v. Selective Service System Local Bd. No. 11,

393 U.S. 233, 241 (1968) (concurring opinion) (noting, "in general, a court may dispose of a challenge to the validity of [a] procedure on the pleadings"). Instead, we would necessarily have to review the factual and discretionary decisions inherent in that procedure. Third, having concluded plaintiff has no property interest in a "properly calculated" 1992 conversion factor, we see no need to apply the ultra vires doctrine because plaintiff is at no risk of being subjected to loss of an interest without remedy. See Leedom v. Kyne, 358 U.S. 184, 191 (1958) (holding, where Congress has given a "right" to a party, "it must be held that [Congress] intended that right to be enforced," particularly in situations where an agency is alleged to have acted in excess of its delegated powers). Finally, the relief sought by plaintiff (i.e., a recalculation of the 1992 conversion factor, along with supplemental payments for 1992) prevents him from relying on the ultra vires doctrine. In Larson, the Supreme Court noted a suit relying upon the ultra vires doctrine

> may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.

337 U.S. at 691 n.11. Here, the requested relief would require us to go well beyond ordering the Secretary to cease doing something. Specifically, it would require us to order the Secretary to take various forms of affirmative action, and would require an outlay of federal funds to satisfy the supplemental payments requested by plaintiff.

> D.      *Does the separation of powers doctrine require judicial review of the Secretary's actions?*

In his final argument, plaintiff asserts the separation of powers doctrine requires judicial review of the Secretary's calculation of the 1992 conversion factor. To hold

-14-

otherwise, plaintiff argues, would allow the executive branch, rather than the judiciary, to be the final interpreter of the law.

In Bartlett v. Bowen, 816 F.2d 695 (D.C. Cir. 1987), the District of Columbia Circuit succinctly described the judiciary's role under the separation of powers doctrine:

> Since Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the Supreme Court has interpreted the Constitution to give to the judiciary an important, albeit limited, role in the structure of the government. First, federal courts fulfill their role *only* by adjudicating cases or controversies before them. Second, when faced with a proper case or controversy, courts, both state and federal, must apply all applicable laws in rendering their decisions. Third, courts have a duty to uphold the Constitution. Fourth, a law contrary to the Constitution may not be enforced. Last, a final judgment by a court is binding and must be enforced. So, once a case or controversy reaches the courts, the courts, in essence, become the final arbiters as to the constitutionality of government actions.

Id. at 706-07 (emphasis in original) (footnotes omitted).

Applying these principles to the instant case, we find no merit to plaintiff's separation of powers argument. In enacting the "no review" provision and prohibiting review of the Secretary's calculation of the conversion factor, we find no indication that Congress intended to infringe upon the powers of the judiciary and prohibit review of substantial constitutional issues. To the contrary, we conclude Congress simply intended to prevent judicial "second-guessing" of a discretionary administrative decision that is based substantially upon economic projections and cost analyses. Moreover, because plaintiff has not presented any constitutional challenges to the Secretary's computation of the 1992 conversion factor, and because we have reviewed and rejected his constitutional challenges to the Medicare Act's "no review" provision, we conclude the separation of powers doctrine actually weighs against, rather than in favor of, judicial review of plaintiff's claim. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803) ("The

-15-

province of the court is . . . not to inquire how the executive, or executive officers, perform duties in which they have a discretion."); see also In re Joint Eastern and Southern Districts Asbestos Litigation, 891 F.2d 31, 35 (2d Cir. 1989) (holding, "[i]f substantial constitutional issues are not implicated, the wisdom of decisions made by the executive and legislative branches are not subject to judicial review"); Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574, 579 (3d Cir. 1979) (holding that it would be "unseemly . . . for a court to substitute its judgment for that of an executive or agency official" in situations where "the challenged decision is the product of political, military, economic, or managerial choices that are not really susceptible to judicial review.").

IV.

The judgment of the district court is AFFIRMED.