GREATER DALLAS HOME CARE ALLI-
ANCE, Metro Home Health, Inc., Chris-
tian Home Health, and Nurse Call Home
Health, Plaintiffs,

v.

UNITED STATES of America (Depart-
ment of Health and Human Services,
Donna Shalala, Secretary and the
Health Care Financing Administration),
et al., Defendants.

CIV. A. Nos. 3:98–CV–0768–
H, 3:98–CV–0821–H.

United States District Court,
N.D. Texas,
Dallas Division.

June 22, 1998.

William Todd Hughey, Law Office of William T. Hughey, Dallas, TX, for Plaintiffs Greater Dallas Home Care Alliance, Metro Home Health, Inc., Christian Home Health, Nurse Call Home Health.

Michael E. Clark, Gardere & Wynne Sewell & Riggs, Houston, TX, Craig Buck Florence, Gardere & Wynne, Dallas, TX, James C. Pyles, Powers Pyles Sutter & Verville, Washington, DC, for Consolidated Plaintiffs Texas Ass'n for Home Health Care, Rockwall Home Health Inc., Medical Insights & Care Unlimited, Inc., Cardiovascular Home Care, Inc.

Paula Mastropieri Billingsley, U.S. Atty's Office, Dept. of Justice, Dallas, TX, David O. Buchholz, Carol Federighi, U.S. Dept. of Justice, Washington, DC, for Defendants U.S., Dept. of Health and Human Services, Donna NMI Shalala, Health Care Financing Admin., Palmetto Government Benefits Administrators.

Paula Mastropieri Billingsley, U.S. Atty's Office, Dept. of Justice, Dallas, TX, for Consolidated Defendant Nancy Ann Min DeParle.

## *MEMORANDUM OPINION AND ORDER*

SANDERS, Senior District Judge.

On June 10, 11 and 12, 1998, the Court heard evidence and oral argument on Plaintiffs' Motion for Preliminary Injunction, filed May 18, 1998; Defendants' Memorandum in Opposition, filed May 28; and related pleadings and briefs.

*Summary*

Plaintiffs, seeking a preliminary injunction, sue Defendants alleging that the Congress acted irrationally and unconstitutionally in adopting legislation in 1997 changing the method of payment and reimbursement to providers of home health care. Plaintiffs further allege that the Health Care Financing Administration ("HCFA") failed to follow regulatory statutes in implementing the legislation. Plaintiffs also assert breach of contract by Defendants.

Defendants deny Plaintiffs' claims. Defendants say that Congress acted constitutionally for the legitimate purpose of reducing medicare costs and to curb abuses in the home health care system. Defendants further say that HCFA acted in compliance with the law.

The Court concludes that Congress did not act unconstitutionally and that it is not the function of the Court to determine the wisdom of this congressional action. The Court also concludes that HCFA acted correctly. The Court is of the opinion that Plaintiffs have not met the requirements for issuance of a preliminary injunction. Plaintiffs' Application must be denied.

## I. Background

Medicare is a federal health insurance program to provide medical care to eligible elderly and disabled patients. *See* 42 U.S.C. §§ 1395(c), 1395(d). While the Secretary of Health and Human Services ("HHS") is charged with the administration of the Medicare Act, HCFA is the agency to which this responsibility has been delegated. Home health care agencies ("HHAs") provide medical care to homebound Medicare beneficiaries and are reimbursed in accordance with the Medicare Act and HCFA's implementing regulations.[1]

HHAs provide skilled services and deliver medical items and treatment pursuant to a plan of care that is established and reviewed every 62 days by a physician. HHAs must provide Medicare patients with the same level of care that is furnished to their non-Medicare patients, if any. HCFA contracts with fiscal intermediaries to monitor the financial administration of the HHAs. The HHAs submit cost reports to the fiscal intermediaries within five months after their cost reporting period closes and the HHAs receive periodic reimbursements during the year until their final cost reports are settled. When an HHA's fiscal year ends and it files its annual cost report, then the fiscal intermediary determines whether the periodic payments resulted in an overpayment or an underpayment, at which point the fiscal intermediary either issues another payment to the HHA or requires the HHA to remit any overpayments.

Medicare has traditionally reimbursed HHAs pursuant to a *reasonable cost* system which mandated that the HHAs be reimbursed for services rendered to Medicare beneficiaries in accordance with the reasonable costs that they incurred capped by a predetermined maximum limit.[2] However, the traditional reasonable cost reimbursement method was modified when, on August 5, 1997, the Balanced Budget Act ("BBA") was enacted. In that Act, Pub.L. No. 105–33, Congress mandated significant changes in the HHA payment methodology. These changes are incorporated in Sections 4602 and 4603 of the Act. Congress directed that, for cost reporting periods beginning on or after October 1, 1999, HHAs be paid under a Prospective Payment System ("PPS") similar to that utilized for other medicare providers such as hospitals. Pub. L No. 105–33, § 4603(a), *codified at* 42 U.S.C. § 1395ff(a), (b). Until that system can be implemented, Congress required that HCFA implement an Interim Payment System ("IPS"). *Id.*, § 4602 *codified at* 42 U.S.C. § 1395x(v)(1)(L). Congress intended that, in many cases, HHAs' total annual payments under the IPS for treating the same number of beneficiaries as they had before the BBA

---

1. Under 42 U.S.C. § 1395ff(a), HCFA is authorized to promulgate regulations concerning reimbursement limits and the determination of covered claims.

2. "Reasonable cost" was and remains defined as "...the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services..." 42 U.S.C. § 1395x(v)(1)(A).

would be lower than before Congress passed the BBA. The present consolidated case challenges the IPS system.

The legislative history reflects that Congress was attempting to maintain the economic viability of the Medicare system by containing costs and reducing perceived fraud in the home health care industry.[3] *See* H.R.Rep. No. 49, 105th Cong., 1st Sess. (1997), *reprinted in* 1997 WL at 1330–31, 133–36, 2514.[4] Effective October 1, 1999, and not later than October 1, 2003, HHAs will be reimbursed in conformity with the Prospective Payment System ("PPS") under which HHAs will receive predetermined levels of reimbursement which are intended to account for each patient's unique medical needs. Until the PPS becomes effective, however, the IPS will be operative. Under the IPS, HCFA will pay HHAs on a *modified* reimbursement basis which, according to Plaintiffs, bears no relation to an individual patient's medical requirements.

To begin implementing the IPS, HCFA promulgated revised per visit cost limits on January 2, 1998. *See* 63 Fed.Reg. 89, 92–93 (1998).[5] Thereafter, on March 31, 1998, HCFA promulgated the new maximum per beneficiary limits. *See* 63 Fed.Reg. 15, 717 (1998).[6] These caps were effective as of October 1, 1997.

## II. Plaintiffs' Contentions

Plaintiffs allege that the IPS and the regulations implemented by HCFA violate their procedural and substantive due process rights as well as their equal protection rights under the Fifth Amendment to the Constitution of the United States because the new cost limits are based, especially with respect to HHAs that did not have a final cost report for the 1994 fiscal year, on the flawed presumption that such HHAs have the same average cost per patient. Plaintiffs further contend that because HHAs are prohibited from adjusting the type of services provided (they must follow the physician's plan of care) and because HHAs cannot discriminate against Medicare patients with respect to non-Medicare patients, HHAs will be forced to care for patients at a loss. As a consequence, the new statute and regulations will, allegedly, force many HHAs out of business or into bankruptcy.

The IPS limits apply to the HHAs' cost reporting periods beginning on or after October 1, 1997. However, it was not until after HCFA promulgated the cost limits in the January 2, 1998 and March 31, 1998 regulations that the fiscal intermediaries could start calculating the HHAs' reimbursements in accordance with the new limits. Consequently, HHAs are currently receiving de-

---

**3.** Defendants produced evidence that the Inspector General of HHS reports that 40% of the services provided by HHAs are not needed.

**4.** Congress noted that HHAs were growing at a rate in excess of that of private health care markets and that this growth was in large part "...fueled by relatively generous payments, coverage policies, and little agency oversight." H.R.Rep. No. 49, 105th Cong., 1st Sess. (1997), *reprinted in* 1997 WL at 2708.

**5.** While the per visit cost limits used to be calculated at 112 percent of the mean of the labor-related and non-labor per visit costs for freestanding home health agencies, the IPS lowered the limit to 105 percent of the median of such costs. 42 U.S.C. § 1395(x)(v)(1)(L)(i)(IV).

**6.** An HHA which had a full cost reporting period ending during the 1994 fiscal year is to receive reimbursements calculated according to per beneficiary cost limits based 75 percent on 98 percent of the reasonable allowable costs for the HHA's 12–month cost reporting period ending

during fiscal year 1994 and based 25 percent on 98 percent of the standardized regional average of such costs for the HHA's census division, as applied to such HHA, for cost reporting periods ending during fiscal year 1994, such costs updated by the home health market basket index. 42 U.S.C. § 1395(x)(L)(v)(I). This limit is to be multiplied by the HHA's unduplicated census count of Medicare patients for the cost reporting period subject to the limitation. *Id.* at (v)(II). For beneficiaries who use services furnished by more than one HHA, the per beneficiary limit is to be prorated among such HHAs. *Id.* at (vi)(II). In addition, the market basket update, which adjusts the 1994 figures to reflect inflation, is not to include inflation from July 1, 1994, to July 1, 1996. *Id.* The cost limits are applied on an aggregate basis for each HHA, rather than on a discipline specific basis. *See* 42 U.S .C. § 1395x(L)(ii). An HHA that did not have a full cost reporting period end during 1994 or that is "new" will receive per beneficiary limits equal to the median of the limits (or the Secretary's best estimate thereof) applied to the other HHAs. *Id.* at (vi)(I).

mand letters for any overpayments since their cost reporting year beginning on or after October 1, 1997. Plaintiffs assert that this is a retroactive taking of property in violation of their substantive and procedural due process rights under the Fifth Amendment to the Constitution.

Plaintiffs further contend that the IPS and the attendant HCFA regulations are unconstitutional because they calculate cost limits based on the 12 month cost reporting period ending between October 1, 1993 and September 30, 1994, without allowance for the specialized programs that many HHAs have recently developed and without making appropriate adjustments for inflation. Thus, Plaintiffs allege, the new formulas for determining the cost limits unfairly reward HHAs who did not control their costs in fiscal 1994 (because they will be permitted a higher reimbursement) and penalize both new HHAs that currently provide care to high cost patients and old HHAs that treat more high cost patients now than they did during the 1994 fiscal year.

Plaintiffs additionally allege that the IPS is irrational because it is premised on erroneous financial and statistical projections issued by the Congressional Budget Office ("CBO") regarding, for instance, the growth rate of HHAs. Also, Plaintiffs allege that Congress relied on inaccurate information concerning the effect and impact of steps that the HHAs will take in order to adapt to the new regulations.[7]

Plaintiffs levy against the Government several other allegations to support their contention that the statute and regulations at issue are irrational and unconstitutional. For instance, Plaintiffs contend that it is inequitable that the new regulations require that HHAs that treat the same patients during the same cost reporting period are required to share the reimbursement on a pro rata basis, regardless of who bore the major share of the costs. Also, Plaintiffs claim that on February 6, 1998, HCFA Administrator

Nancy–Ann Min DeParle violated their First Amendment rights when she sent to them letters stating that any reports of HHAs misinforming beneficiaries or inappropriately terminating care for Medicare enrollees will be considered the basis for a complaint survey that could lead to termination of such HHAs from Medicare. *See* Letter from Nancy–Ann Min DeParle to HHAs of 2/6/98 (PX 41).

### III. Preliminary Injunction Standard

In the Fifth Circuit, a party is entitled to injunctive relief upon demonstrating: 1) a substantial likelihood of success on the merits of the claim; 2) a substantial threat of irreparable injury for which there is no adequate remedy at law; 3) that the threatened injury to the applicant outweighs any harm that the injunction might cause to the opponent; and 4) that the injunction will not disserve the public interest. *DSC Communications Corp. v. DGI Technologies, Inc.*, 81 F.3d 597, 600 (5th Cir.1996); *National Football League Properties v. Playoff Corp.*, 808 F.Supp. 1288, 1291 (N.D.Tex. 1992). A preliminary injunction is an extraordinary remedy and should be granted only if the applicant has clearly carried the burden of persuasion with respect to all four factors. *Allied Marketing Group v. CDL Marketing*, 878 F.2d 806, 809 (5th Cir.1989).

For the reasons which follow, the Court has determined that Plaintiffs have not established a right to injunctive relief.

### IV. Likelihood of Success on the Merits

**A. Plaintiffs' Likelihood of Success on the Merits of their IPS Unconstitutionality Claims.**

**1) Fifth Amendment Substantive and Procedural Due Process Challenge to the Prospective Application of the IPS**

Plaintiffs contend that the IPS was enacted in violation of their substantive and

---

**7.** The CBO allegedly predicted, incorrectly, that HHAs would recruit more low cost patients and discharge patients earlier.

Plaintiffs claim that in January of 1998, the CBO revised its previous projections after finding that the growth of home health care was not accelerating at the rate it had previously estimat-

ed. Accordingly, the CBO lowered its baseline projections of Medicare's spending for home health from $41.2 billion to $37.5 billion between 1998 and 1999. Plaintiffs contend that the new IPS cost limits would have been different had Congress been operating pursuant to the revised, accurate projections.

procedural due process rights under the Fifth Amendment. Specifically, Plaintiffs aver that the cost limits provided for in the IPS are irrational and will result in HHAs being forced either to turn away many of the sickest Medicare patients or to go out of business.[8] This dilemma will arise, according to Plaintiffs, because despite Medicare Act's requirement that they provide reasonably necessary medical services to their Medicare patients, many HHAs will not be reimbursed an amount sufficient to cover the costs and expenses associated with providing care to "high cost patients"—thus, although the IPS has allegedly decreased many HHAs' cost limits, there has been no corresponding reduction in Medicare patients' home health benefits. Plaintiffs contend that while the IPS bases the new reimbursement scales on cost reports for the 1994 fiscal year, the IPS lacks any mechanism to account for increased costs borne by agencies that either added new services since fiscal 1994 or that have since then begun caring for sicker (more expensive) patients. Plaintiffs argue that their dilemma will spill over into other facets of the Medicare program, for not only are they prohibited by law from accepting Medicare patients whose needs they cannot meet because they will not have the resources to treat such patients, but also the stringent new cost limits will render it impossible for them to provide reasonable care to their existing patients. See 42 C.F.R. § 484.18.

Plaintiffs further allege that those HHAs that are considered "new" or that do not have final cost reports for the 1994 fiscal year (which, according to Plaintiffs, comprise a substantial percentage of the HHAs currently operating in Texas) are severely penalized by the new limits because the national median rate that is utilized for "new" HHAs is generally lower than the limits that such HHAs have been operating under.

■ Plaintiffs have also provided the Court with evidence demonstrating the financial hardships that the IPS may cause HHAs. It seems possible that many of the HHAs will be forced out of business due, in part, to the fact that their patient mixes do not consist of enough low cost patients to enable them to "take advantage" of the fact that the cost limits are determined on an aggregate basis. However, Plaintiffs' due process contentions are essentially policy arguments. Regardless of whether or not Congress acted wisely in enacting the IPS, it is not the province of the Court to nullify an act of Congress because it may be imprudent or unsound. See Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (a court need only find some reasonably conceivable state of facts that could provide a rational basis for the legislative action); Vance v. Bradley, 440 U.S. 93, 108, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (refusing to overturn a statute unless the varying treatment of different groups or persons was so unrelated to the achievement of any combination of legitimate purposes that the court could only conclude that the legislature's actions were irrational); Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (the Due Process clause can be thought to interpose a bar to withholding a benefit under a social welfare program only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification).

Indeed, Defendants have presented evidence demonstrating a rational basis for the IPS—that the budget cuts in the Medicare program were enacted to keep the program solvent, especially in light of what Congress has found to be a rapidly increasing cost to the Medicare trust fund by HHAs. See H.R.Rep. No. 49, 105th Cong., 1st Sess. (1977), reprinted in 1997 WL at 2798; see also, Hodel v. Indiana, 452 U.S. 314, 331–32, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (applying the rational basis test to economic legislation). For instance, in response to Plaintiffs' contention that the IPS lacks a case adjustment mixer to offset increased costs borne by HHAs that added new or costly services or changed their patient mix to care for more medically needy patients since the 1994 baseline fiscal year, Defendants present evidence

---

8. According to testimony adduced by Plaintiffs HHA patients are among the poorest, sickest, and oldest of the Medicare population; without home health care most (perhaps as many as 80%) will be cared for in hospitals or long-term care institutions.

of a rational basis for Congress's decision by providing legislative history demonstrating that Congress felt that an HHA's own historic experience was a reasonable proxy for case mix, and accordingly based 75 percent of the per beneficiary limit on such historic costs. *See Medicare Home Health Care: Hearing Before the Subcommittee on Health and Environment of the House Committee on Commerce,* 195th Cong., 1st Sess. 15–17 (1997) (DX 101). Moreover, Plaintiffs' allegations that the IPS was based on predictions of home health care growth that the CBO has since revised is irrelevant. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (where there was evidence before the legislature reasonably supporting the statute, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken).

Additionally, the legislative history of the IPS demonstrates that, under the old reimbursement system, HHAs had no incentive to control their costs and, moreover, that Congress felt that the rapid increase in home health expenditures was disproportionately contributing to the depletion of the Medicare trust. *See Medicare Home Health Care: Hearing Before the Subcommittee on Health and Environment of the House Committee on Commerce,* 195th Cong., 1st Sess. 15–17 (1997) (DX 101). Accordingly, Congress (as stated above) legislated the IPS with the intent of maintaining the viability of the Medicare trust. In fact, Congress's desire for immediate savings resulted in the enactment of the IPS as a temporary measure until the PPS can be properly developed and implemented.[9]

The Court is mindful that not only is it a basic tenet of the Medicare program that Congress has the right to alter, amend, or repeal any provision of the Medicare Act, but also that Plaintiffs are voluntary participants in the program and are under no compulsion to continue their participation. *See* 42 U.S.C. § 1304. Therefore, in light of the fact that Congress has the authority to eliminate

the home health care benefit in its entirety and because the IPS is a result of lawful Congressional policy making, the Court cannot find irrational Congress' efforts to maintain the viability of the Medicare program.

Plaintiffs have not demonstrated a substantial likelihood of success on their claims regarding the prospective application of the IPS.

### 2) Fifth Amendment Substantive and Procedural Due Process Challenge to the "Retroactive" Application of the IPS

Plaintiffs allege that, in requiring that the HHAs return the overpayments received for services provided since the HHAs' cost reporting years beginning on or after October 1, 1997, the Government is retroactively depriving them of a fundamental interest in their property rights and, as a result, is violating the Takings clause of the Fifth Amendment to the Constitution.

The Medicare system has traditionally required that at the end of its fiscal period, an HHA must either remit any overpayments to HHS or that HHS must reimburse the HHA if the previous reimbursements were insufficient. Thus, the Government's current demands for retroactive payments are not a novel concept in the Medicare context. Accordingly, Plaintiffs' contentions that they are being deprived of their property interest by way of an illegal, retroactive taking is not grounded in the fact that they are being required to remit overpayments, but rather stems from the Government's demands that they return overpayments accrued since their fiscal year starting on or after October 1, 1997 despite the HHAs' alleged lack of knowledge about the specifics of the new per beneficiary limits until the March 31, 1998, regulation was issued.

Plaintiffs complain that, due to the lack of notice, they were unable to adjust their practices so as to minimize the impact of the new "retroactive" cost limits. Plaintiffs contend

---

9. In its March 31, 1998 regulatory impact statement, HCFA concluded that the IPS will contribute $1.4 billion in reductions in Medicare payments for fiscal year 1998. 63 Fed.Reg. at 15,

736. HCFA goes on to project that the IPS will result in approximately $2 .75 billion in Medicare savings for fiscal year 1999. *Id.*

that the application of the IPS will require HHAs to remit as much as ·61 percent of their reimbursement earned since October of 1997. Such demands, according to Plaintiffs, are unconscionable, for the HHAs were prohibited (and remain so) from making a profit on the services they rendered to Medicare beneficiaries or from accumulating assets other than accounts receivable. Further, Plaintiffs claim that their post October 1, 1997, reimbursements were already disbursed for costs incurred in rendering services prior to the implementation of new HCFA regulations. Consequently, Plaintiffs insist, the Government is demanding the remittance of funds that simply are not available.

Plaintiffs argue that their constitutional rights are violated by the Congressional requirement for retroactive payments. Plaintiffs also allege that Defendants' failure to provide them with their procedural and substantive due process rights will ultimately cause more rather than less expense to the nation's health care system by forcing many infirm Medicare beneficiaries to seek medical care in hospitals or nursing homes rather than HHAs.

■ Plaintiffs' substantive due process argument, i.e., that they have been conferred a property interest and then been deprived of that interest illegally, is without merit. First, the HHAs are not being deprived of a property interest. Not only did HCFA comply with Congress's deadlines for the implementation of the IPS, but, in addition, the January 2 and March 31 regulations were promulgated in accordance with the formulas explicitly mandated by Congress in the IPS statute enacted August 5, 1997. Thus, the current demands for overpayments made to the HHAs since the start of their cost reporting periods beginning on or after October 1, 1997 merely "...call for the application of the cost reimbursement principles in effect at the time the costs were incurred." *See Re-*

*gions Hosp. v. Shalala,* —— U.S. ——, ——, 118 S.Ct. 909, 915, 139 L.Ed.2d 895 (1998). As such, the demands are not retroactive and do not constitute a deprivation of property..

■ As alluded to already, it is significant that even before IPS, HHAs could be required to remit overpayments; accordingly, Plaintiffs were on notice as of August 5, 1997, that the payments made to them for their cost reporting years beginning on or after October 1, 1997 were subject to change. Because Plaintiffs were on notice of the IPS's changes to the cost reimbursement formulas as of August 5, 1997, they could have begun (and many did begin) preparing for a change in the system well before HCFA's January 2 and March 31 regulations were issued. While many HHAs may have received overpayments prior to the full implementation of the per beneficiary limits, they are not entitled to retain such overpayments, for they have no property interest in Medicare overpayments.[10] *See Painter v. Shalala,* 97 F.3d 1351, 1358 (10th Cir.1996) (noting that the physician had the option not to treat the patients); *Whitney v. Heckler,* 780 F.2d 963, 972 (11th Cir.1986) (the establishment of certain price structures does not amount to a taking of property when the regulated entities' participation in the Medicare program is voluntary). So, even if the Court were to find that Plaintiffs have a property interest in the Medicare payment, it does not follow that Plaintiffs have a property interest in a level of benefits that is greater than Congress has provided. *See Flemming v. Nestor,* 363 U.S. 603, 610–11, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (Congress has retained the right to alter, amend, or repeal any provision of the Medicare Act); *Smith v. North La. Med. Rev. Ass'n,* 735 F.2d 168, 172 (5th Cir.1984) (the federal government has assumed no blanket responsibility to compensate physicians or hospitals for services they render to patients; instead, the Government has assumed the obligation to compensate

---

10. Even if the IPS were retroactive, that alone is not a sufficient basis for finding a statute to be unconstitutional. *See United States v. Sperry Corp.,* 493 U.S. 52, 64, 110 S.Ct. 387, ·107 L.Ed.2d 290 (1989) (citing *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729–30, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)) (if the retroactive application of the statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches).

providers of the medical service to the extent those services are covered by the Medicare Act); *Painter,* 97 F.3d at 1358 (10th Cir. 1996) (physicians have no property interest in a greater amount for a particular service than was outlined in the regulation).

■■■■ Plaintiffs' procedural due process argument, i.e., that they were denied adequate pre-deprivation hearings, fails because the Congressional enactment itself was sufficient procedure. Congress may at any time alter the terms of the reimbursement formula, for the procedural due process requirement does not impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to a public benefit. *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). Indeed, the apparent suggestion that the Congress must provide each HHA with a hearing prior to adopting the IPS is devoid of legal support as well as impractical. *Atkins v. Parker,* 472 U.S. 115, 130, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985) (the legislative determination provides the necessary due process); *United States v. LULAC,* 793 F.2d 636, 648 (5th Cir.1986) (when the legislature enacts a law that affects a general class of persons, all of those persons have received procedural due process by the legislative process itself).

Plaintiffs did not establish a substantial likelihood of success on the merits of their claims regarding the "retroactive" application of the IPS.

### 3) Breach of Contract

■■■■ Plaintiffs contend, apparently, that Defendants' breach of the duty of good faith and Defendants' unconscionable conduct constitute a breach of contract. Plaintiffs argue that the Medicare participation agreements between the Defendants and the HHAs are essentially contracts. The Court disagrees and finds that the participation agreements are not contracts, for the right to receive payments under the Medicare Act is a manifestation of Government policy and, as such, is a statutory rather than a contractual right.

*See Memorial Hospital v. Heckler,* 706 F.2d 1130, 1136 (11th Cir.1983); *see also, Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986); *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985).

Accordingly, Plaintiffs' breach of contract claim is unlikely to succeed on the merits.

### 4) Fifth Amendment Equal Protection Challenge to the IPS

■■■■ Plaintiffs' claim that the IPS violates the Equal Protection clause of the Fifth Amendment is grounded in their assertion that various HHAs are reimbursed differently under the IPS. For instance, Plaintiffs assert that HHAs that had a final cost reporting period for the 1994 fiscal year and were inefficient during that period are generally subject to (and gain the advantage of) higher per beneficiary cost limits than "new" HHAs, which are reimbursed in accordance with the national median average of HHAs with full cost reporting periods in the 1994 fiscal year.[11]

■■■■ Plaintiffs' claim fails because the Equal Protection clause is intended to prohibit only those laws that impact fundamental rights or create suspect classifications. *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 462, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988). The IPS does not classify HHAs other than by whether they had a 12 month cost report ending in federal fiscal year 1994. The fact that the IPS might have a different economic impact upon "old" and "new" HHAs does not constitute a violation of the Equal Protection clause not only because no fundamental rights are implicated, but also because no suspect class is involved. The IPS classification is reviewed under the highly deferential rational basis standard applicable to economic legislation. *See, e.g., Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (social and economic legislation that does not employ suspect clas-

---

11. Defendants contend that Plaintiffs' contention is not correct because the payments under the IPS are based in large part (75 percent) upon that HHA's own historical costs. Therefore, prior efficiencies are penalized only to the extent such efficiencies are no longer present.

sifications or impinge on fundamental rights must be upheld against an equal protection attack when the legislative means are rationally related to a legitimate governmental purpose); *see also, Nordlinger v. Hahn*, 505 U.S. 1, 9, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Indeed, Congress's selection of the 1994 fiscal year as the base year is rationally related to its goal of limiting soaring home health care costs, as it is the most recent year for which the Government has complete cost reporting data on HHAs. As such, it was logical to use this year as the cut-off for distinguishing "new" and "old" agencies. There exists yet another rational basis for the selection of the 1994 baseline year for formulating historical costs (as versus, for instance, the use of a more recent baseline year): using 1994 as a base year eliminates from the cost limits the excesses in spending associated with home health care since that time period. H. Rep. No. 105–149 (1997).

In addition, Plaintiffs have not alleged (nor can the Court discern) any discriminatory purpose on the part of Congress which would support a finding of a violation of the Equal Protection clause. *See Johnson v. Rodriguez*, 110 F.3d 299, 306–07 (5th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997). In fact, as alluded to above, if a law neither burdens a fundamental right nor targets a suspect class, the Court must uphold the law so long as it bears a rational relation to some legitimate end, regardless of whether it might seem to work to the disadvantage of a particular group, or if the rationale for it seems tenuous. *Romer v. Evans*, 517 U.S. 620, 631–32, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *see also, Bowen v. Gilliard*, 483 U.S. 587, 598, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) (review of Congress's decisions to spend money to improve the general public welfare in one way and not another is particularly deferential).

The Court is therefore of the opinion that Plaintiffs' claim under the Equal Protection clause is unlikely to succeed on the merits. *See Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (the plaintiffs have the burden of negating every conceivable basis which might support Congress's classifications).

### B) Plaintiffs' Likelihood Success of Success on the Merits on Their Claims Regarding the January 2, 1998 and March 31, 1998 HCFA Regulations Implementing the IPS

Plaintiffs assert that their claims apply to HCFA's implementing regulations in addition to the Congressional enactment itself. However, the Court finds that not only did HCFA issue its final rules within the deadlines set forth in the Balanced Budget Act, but also that HCFA's regulations were merely furthering the statutory mandate.[12] The Court is therefore of the opinion that HCFA did not act in a fashion that was arbitrary, capricious, or contrary to law. *See* 5 U.S.C. 706(2)(A)—(D); *see also, EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (the Court must show great deference to the agency's interpretation of its powers and responsibilities).

### i) The Regulatory Flexibility Act

Plaintiffs also assert that HCFA violated 5 U.S.C. § 604(a)(5) of the Regulatory Flexibility Act because it did not, in its promulgation of the January 2, 1998, and March 31, 1998, regulations, assess the costs and benefits of available regulatory alternatives and select approaches to maximize these net benefits, including more cost effective options for regulatory relief for many of the HHAs, i.e, those that are "small businesses."[13] *See,* 5

---

12. While HCFA did supply some additional details in its promulgation of the IPS regulations, Plaintiffs have produced no testimony or evidence to suggest that such decisions were contrary to Congressional intent.

13. It is undisputed that many HHAs are "small businesses" as defined by the Regulatory Flexibility Act. *See* 15 *U.S.C.* § 632 *et seq.;* 13 C.F.R. § 121.101 *et seq.*

U.S.C. § 604(a)(5) (delineating the requirement that the agency conduct an analysis on minimizing the significant economic impact of the rule on small entities and that the agency design mechanisms to minimize any adverse consequences).

Title 5 U.S.C. § 611(a)(1) provides that small entities adversely affected or aggrieved by a final agency action are entitled to judicial review of agency compliance with the requirements of § 604 (as well as other sections). Title 5 U.S.C. § 611(a)(4) states that, in granting relief in an action under this section, the Court shall take corrective action consistent with this chapter and chapter 7 (including the arbitrary and capricious standard prescribed by 5 U.S.C. § 706(2)(A)). Corrective action may include a) remanding the rule to the agency, and b) deferring the enforcement of the rule against small entities unless the Court finds that continued enforcement of the rule is in the public interest.

■ The IPS statute sets forth in detail the formulas for the new cost limits. Accordingly, the Court finds that HCFA was merely implementing Congress's directives and was therefore not required to conduct a § 604(a)(5) analysis. *See* S.Rep. No. 878, 96th Cong., 2nd Sess. 13 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2788, 2800 ("...the bill does not require an agency to consider each listed alternative during each rulemaking proceeding. Some statutes, for example, place explicit limitations on agency discretion in rulemaking.").[14] If uniform requirements are mandated by statute, as in the IPS, a statement to that effect by the implementing agency, i.e., HCFA, obviates the need to solicit or consider proposals which include differing compliance standards. Since the January 2, 1998, and March 31, 1998, regulations were merely the implementation of the Congressional mandate embodied in the IPS, HCFA made the appropriate statements in

its regulations. *See* 63 Fed.Reg. 15, 717 (1998) ("...the statute does not allow for any exceptions to the aggregate per beneficiary limitation based on the size of the entity. Therefore, we are unable to provide any regulatory relief for small entities.").

Plaintiffs did not establish a substantial likelihood of success on their claims of violation of the Regulatory Flexibility Act.

## C) Plaintiffs' Likelihood Success of Success on the Merits on the First Amendment Claim

■ Plaintiffs allege that HCFA violated their First Amendment right of free speech when, on February 6, 1998, HCFA Administrator Nancy–Ann Min DeParle sent letters warning HHAs that their participation agreements will be terminated if they misinform beneficiaries about their Medicare coverage or inappropriately terminate care for Medicare enrollees. *See* Letter from Nancy–Ann Min DeParle to HHAs of 2/6/98 (PX 41). The Court finds that the letter did not illegally chill Plaintiffs' freedom of speech, for Plaintiffs do not have a constitutionally protected right to mislead Medicare beneficiaries. *See, e.g., Edenfield v. Fane,* 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771–72, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

## V. The Three Remaining Requirements for Preliminary Injunction.

Earlier in this Opinion, the Court set forth the four requirements for issuance of a preliminary injunction. An applicant must meet all four requirements in order to obtain an injunction. The Court has found that Plaintiffs did not establish the first requirement, *viz.,* likelihood of success on the merits. The Court is therefore not required to reach the

---

**14.** None of HCFA's discretionary input could be of sufficient magnitude to necessitate an analysis pursuant to 5 U.S.C. § 604(a)(5). For instance, Plaintiffs point to 42 U.S.C. § 1395x(L)(vi)(I), which states that for new providers and those providers without a 12 month cost reporting period ending in fiscal year 1994, the per beneficiary limitation "...shall be equal to the *median* of these limits (or the Secretary's best estimates

thereof) applied to other home health agencies..." (emphasis added). Plaintiffs argue that it was improper for HCFA to use a *national* rather than a *regional* median figure. The Court finds, however, that HCFA in calculating the per beneficiary cost limits, made the only interpretation possible in light of the language of the IPS statute.

remaining three prongs of the injunctive standard but will do so, briefly. Those three requirements are (1) irreparable harm to the applicant for which there is no adequate remedy at law, (2) that the threatened injury to the applicant will outweigh any damage that the injunction might cause to the opponent, and (3) that the injunction will not disserve the public interest.

The Court addresses first the public interest requirement. The public has a formidable interest in Congress's efforts to stem the unsustainable growth of the home health care benefit and thereby effectuate savings in the Medicare program. *See* Welch, Weinberg, and Welch, *The Use of Medicare Home Health Care Services,* NEW ENG. J. OF MED., Aug. 1, 1996, at 324, 324 (DX 105) (home health care reimbursements grew from $2 billion in 1988 to $12.7 billion in 1994 and as of 1996 accounted for over 8 percent of the total budget for Medicare); *see also, Medicare Home Health Care: Hearing Before the Subcommittee on Health of the Committee on Ways and Means House of Representatives,* 105th Cong., 1st Sess. 2, 18 (1997) (DX 102) ("Medicare payments to post-acute care providers continue to be the fastest growing component of the Medicare program. Medicare home health care and skilled nursing facility payments have each increased, on average, by more than 30 percent per year since 1990. High rates of growth are fueled by Medicare's payment policies which provide few incentives for post-acute care providers to provide services more efficiently and reduce costs.... It is unfortunately true that fraud and abuse also play a significant role in the high growth rates of home health.")

Moreover, the public has a powerful interest in the maintaining the doctrine of separation of powers, for Plaintiffs' contentions are essentially policy based arguments within the province of the Congress. *Vance v. Bradley,* 440 U.S. 93, 108, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rec-

tified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."). The Court's reluctance to overturn an act of Congress is even more profound at this stage in the litigation, for an injunction would impede Congressional intent prior to an adjudication on the merits. *See Turner Broadcasting System v. FCC,* 507 U.S. 1301, 1302, 113 S.Ct. 1806, 123 L.Ed.2d 642 (1993) (Acts of Congress are presumptively constitutional and should remain in effect pending a final decision on the merits); *Walters v. Nat'l Ass'n of Radiation Survivors,* 468 U.S. 1323, 1324, 105 S.Ct. 11, 82 L.Ed.2d 908 (Rehnquist, Circuit Justice), *vacating of stay denied,* 469 U.S. 877, 105 S.Ct. 238, 83 L.Ed.2d 178 (1984) (every Act of Congress is presumptively constitutional). The Court concludes that granting the Application for Preliminary Injunction would disserve the public interest.

The Court turns next to the question of irreparable injury. It would appear that Plaintiffs may be threatened with severe financial injury. However, the Court is unable to find that Plaintiffs do not have an adequate remedy at law by way of a suit for damages should it be established at a trial on the merits that their claims are valid.

The Court addresses finally whether the threatened injury to the Plaintiffs by denial of an injunction outweighs any damage that issuance of the injunction might cause to Defendants. The Court concludes that Plaintiffs did not meet this requirement. While the Court heard testimony that many HHAs are in imminent danger of financial distress and that HHA patients may suffer much hardship, such potential harm must be weighed against the ramifications that an injunction would have on the country as a whole. By preventing the implementation of the IPS, the Court would be stifling Congress's efforts to bring savings to and thereby keep viable the Medicare program, which is a multi-faceted entitlement that provides medical benefits to the entire nation.[15]

---

**15.** The Government has presented evidence and testimony that HHAs have numerous options in determining how to cut costs in order to fall within the IPS's per beneficiary limits. For instance, the Government argues that HHAs can decrease travel, marketing, and salary expenses

The legislative history of the IPS demonstrates that while Congress recognized the advantages to be gained by ultimately moving to the PPS, Congress wanted to act immediately to effectuate savings and control what it perceived to be over-utilization and excessive spending for home health services. *Medicare Home Health Care: Hearing Before the Subcommittee on Health and Environment of the House Committee on Commerce,* 105th Cong., 1st Sess. 43–44 (1997) (DX 101); *See* H.R.Rep. No. 49, 105th Cong., 1st Sess. (1977), *reprinted in* 1997 WL at 2784. In addition, uncollected overpayments to HHAs are already a serious problem. If the Court were to issue a preliminary injunction, then HHAs would accumulate even more substantial overpayments during the course of this litigation, much of which might never be recovered if the Government prevails on the merits.

The Court finds that the harm to the nation by granting the preliminary injunction outweighs the harm to the Plaintiffs which may be caused by denying the injunction.

## VI. Conclusion

Plaintiffs' remedy lies with the Congress, not with the courts. The Motion for Preliminary Injunction is **DENIED.**

SO ORDERED.

---

as well as reduce the amount of unnecessary or unauthorized patient visits. *See, e.g.,* Report of Office of Inspector General, U.S. Dep't of Health and Human Services, *Results of the Operation Restore Trust Audit of Medicare Home Health Services in California, Illinois, New York, and Texas* at 8 (July 1997) (DX 103) (survey demonstrates that claims for many skilled and aide services were determined to be medically unnecessary by the intermediaries' medical review personnel).