Micaela Alvarez, United States District Judge
The Court now considers the motion to dismiss[1] filed by Alex M. Azar II, Secretary *559 of the United States Department of Health and Human Services ("HHS"), and Seema Verma, Administrator for the Centers for Medicare and Medicaid Services ("CMS") (collectively, "Defendants"); Sahara Health Care, Inc.'s ("Plaintiff") response to Defendants' motion to dismiss;[2] and Defendants' reply[3] to Plaintiff's response. Also before the Court are Plaintiff's motion for preliminary injunction;[4] Plaintiff's emergency motion and application for temporary restraining order ("TRO") and injunctive relief;[5] Defendants' response in opposition to Plaintiff's motion for preliminary injunction;[6] Defendants' response in opposition to Plaintiff's emergency motion and application for TRO;[7] Plaintiff's opposed motion for expedited TRO hearing;[8] and Plaintiff's amended motion for preliminary injunction.[9]
After duly considering the motions, record, and relevant authorities, the Court grants Defendants' motion to dismiss, denies Plaintiff's motion for preliminary injunction, denies Plaintiff's emergency motion and application for TRO and injunctive relief, denies Plaintiff's opposed motion for expedited hearing, and denies Plaintiff's amended and corrected motions for preliminary injunction.
I. BACKGROUND
A. Summary
This is a civil action for an injunction brought by Plaintiff, a Medicare-reimbursable service provider, whose Medicare reimbursements were deemed overpaid and ripe for recoupment by Defendants despite Plaintiff's appeals via the first two levels of the Medicare administrative appeals process.[10] Plaintiff alleges such recoupment would result in operation cessation, termination of all employees, and abandonment of patients before Plaintiff will receive a statutorily required hearing before an Administrative Law Judge ("ALJ") through the third level of the Medicare administrative appeals process.[11] As such, Plaintiff seeks injunctive relief to enjoin and restrain Defendants' recoupment of approximately $2.4 million in Medicare overpayment,[12] not including interest, and to preserve the status quo while it proceeds through the remaining available levels of the Medicare administrative appeals process.[13] Defendants maintain the Court lacks jurisdiction over Plaintiff's claims[14] and that Plaintiff fails to state a claim.[15]
*560 B. Factual and Procedural Background
As addressed in the Court's previous order denying Plaintiff's ex parte motion for temporary restraining order,[16] Plaintiff alleges the following facts in its complaint. Plaintiff and its fifty-eight employees and contractors provide home healthcare services to more than one-hundred and fifty patients.[17] Plaintiff's revenue is primarily generated by Medicare receivables.[18]
Plaintiff submitted claims for services provided from July 2013 to July 2016 to Palmetto GBA, the Medicare Administrative Contractor ("MAC"), who initially paid the claims in full.[19] In August 2016, Health Integrity, LLC, the Zone Program Integrity Contractor ("ZPIC") conducted a post-payment review using a "statistically valid random sample" of Plaintiff's claims for reimbursement.[20] The ZPIC's post-payment review of some of Plaintiff's already-paid 2013-2016 Medicare receivables resulted in a determination of approximately $3.6 million in overpayment of reimbursements and denial of several of Plaintiff's claims for reimbursement.[21] Plaintiff contends the extrapolation methodology inflated the actual overpayment amount.[22]
Plaintiff first started proceeding through the Medicare administrative appeals process in March 2017.[23] Following Plaintiff's multiple separate Redetermination Requests, the MAC's Redetermination Decisions partially upheld the overpayment determination.[24] On November 3, 2017, Plaintiff submitted its Reconsideration Request to C2C Innovative Solutions, Inc., the Qualified Independent Contractor ("QIC").[25] On May 31, 2018, Plaintiff received the QIC's final reconsideration decision, thus expiring the second level of the Medicare administrative appeals process.[26]
On June 25, 2018, pursuant to the third level of the Medicare administrative appeals process, Plaintiff timely requested an ALJ hearing to challenge the individual claim denials and the statistical methodology used by the ZPIC and MAC.[27] Statutorily, Plaintiff is entitled to an ALJ hearing by September 23, 2018, within ninety days of its hearing request (which has now passed). Yet, Plaintiff claims the backlog of ALJ dockets projects a hearing in three to five years.[28] Thus, Plaintiff anticipates bankruptcy if recoupment proceeds before obtaining an ALJ hearing, which would *561 render Plaintiff's request for an ALJ hearing moot.
As such, on June 29, 2018, Plaintiff filed its original complaint alleging a procedural due process claim, ultra vires claim, and a "preservation of status of rights" under the Administrative Procedure Act ("APA").[29] Plaintiff also filed a motion for temporary restraining order and brief in support of its motion for application for TRO and injunctive relief.[30]
On July 9, 2018, Defendant HHS was served with process.[31] On July 16, 2018, the Court denied Plaintiff's ex parte request for a TRO and injunctive relief because "Plaintiff had not demonstrated irreparable injury absent a TRO before Defendants could be heard in opposition ."[32] The Court found Plaintiff failed to distinguish extended repayment schedule ("ERS") timelines or the ERS effects on Plaintiff's business either at the time Defendants could be heard on Plaintiff's motion or at the time of an ALJ hearing.[33] Further, the Court found Defendants had not yet violated any statute or regulation or committed ultra vires actions since the ninety-day period had not passed, and in turn, Plaintiff failed to show injury sufficient for injunctive relief.[34] The Court also noted Plaintiff had not briefed the Court on standing issues.[35] Yet, the Court reserved judgment on Plaintiff's request for a preliminary injunction until Defendants could be heard in opposition.[36]
On July 18, 2018, Plaintiff requested a preliminary injunction hearing as opposed to an ex parte temporary restraining order.[37] Defendant CMS was served with process on July 30, 2018.[38] That same day, Plaintiff received a revised demand letter from the MAC, notifying Plaintiff of a revised balance owed and of recoupment within thirty days of the revised demand letter.[39] Specifically, the calculated amount of overpayment changed from $3.4 million to $2.4 million, not including interest.[40] Plaintiff responded to the demand letter by requesting an ERS to repay the recoupment in three hundred monthly installments.[41] However, the MAC denied Plaintiff's three-hundred-month ERS request because the MAC cannot, by statute, approve a request over sixty months.[42] Plaintiff contends a sixty-month ERS (approximately $40,000 per month for Plaintiff) is "equally unattainable and financially devastating ... [and] [a]ccording to [Plaintiff's Administrator's] calculation, [Plaintiff] will be forced out of business within two (2) weeks if the 60-month ERS is imposed."[43]
On August 15, 2018, Defendants jointly responded to Plaintiff's motion for preliminary *562 injunction.[44] The same day, Plaintiff filed a motion for TRO and injunctive relief.[45] On August 28, 2018, Defendants responded to Plaintiff's motion for TRO and injunctive relief, incorporating the substance of their August 15, 2018 response with minimal changes.[46] On August 31, 2018, Defendants filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim.[47]
Recoupment started on September 4, 2018.[48] On September 17, 2018, Plaintiff timely filed a response to Defendants' motion to dismiss[49] and an opposed motion for expedited hearing,[50] updating the Court on the status of the recoupment. Defendants filed a reply to Plaintiff's response on October 12, 2018.[51] Consequently, Defendants' motion to dismiss is now ripe for review.
Finally, Plaintiff filed an amended motion for preliminary injunction,[52] as well as a correction[53] to the amended motion, explaining ERS calculations and recent financial decisions made by Plaintiff's Director of Nursing. The Court now turns to its analysis.
II. DISCUSSION
As a threshold matter, the Court notes that the standing issue it raised in its July order[54] is now resolved as more than ninety days has elapsed since Plaintiff's request for an ALJ hearing. Next, before addressing Defendants' motion to dismiss, the Court disposes of Plaintiff's truncated request for leave to amend. The Court then begins with Defendants' motion to dismiss for lack of subject matter jurisdiction, as the Court's jurisdictional status ultimately dictates whether the Court can issue injunctive relief requested by Plaintiff. After finding the Court has limited jurisdiction over some of Plaintiff's claims, the Court turns to Defendants' motion to dismiss for failure to state a claim because the Court's ruling on the substance of Plaintiff's claims moots Plaintiff's injunctive relief requests.
A. Leave to Amend
The Court first observes Plaintiff's request to amend is part of the conclusion in its response to Defendants' motion to dismiss.[55] Plaintiff simply states: "[i]f the Court inclines to grant Defendants' Motion to Dismiss, Plaintiff requests for an opportunity to amend its Original Petition to rectify any deficiencies."[56] Yet, Plaintiff provides no basis or detail for the proposed amendment. Plaintiff contends its due process pleadings suffice as a stated claim, and Plaintiff fails to apprise the Court of what additional facts it would provide in an amended complaint. Clearly, Plaintiff's request fatally matches requests denied by district courts and subsequently *563 affirmed by the Fifth Circuit.[57] The Court finds amendment unwarranted here. Thus, Plaintiff's request for an opportunity to amend is DENIED . The Court shifts its focus to Defendants' motion to dismiss for lack of subject matter jurisdiction.
B. Rule 12(b)(1) Motion to Dismiss
a. Legal Standard
Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court must dismiss a civil action for lack of subject matter jurisdiction.[58] "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."[59] In conducting a Rule 12(b)(1) analysis, the Court may consider disputed facts and should grant the motion "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."[60] Finally, the burden of establishing federal jurisdiction rests on the party seeking the federal forum.[61]
b. Analysis
Plaintiff asserts jurisdiction pursuant to an exception to the Medicare Act's exhaustion requirement ( 42 U.S.C. § 405(g) ) and by extension § 405(h) (42 U.S.C. § 1395ii);[62] federal question jurisdiction ( 28 U.S.C. § 1331 ); mandamus jurisdiction ( 28 U.S.C. § 1361 ); and the All Writs Act ( 28 U.S.C. § 1651 ).[63] Plaintiff also implies jurisdiction exists under the APA by "preserving" its status under the APA.[64] Defendants contend an exception to the Medicare Act's exhaustion requirement does not apply; Plaintiff's claims are precluded under federal question jurisdiction and mandamus jurisdiction; and the All Writs Act and Administrative Procedures Act ( 5 U.S.C. § 705 ) are not independent bases for jurisdiction. The Court begins analyzing jurisdiction over Plaintiff's claims under the collateral claim exception to 42 U.S.C. § 405(g).
Section 405(g) states a provider may obtain judicial review of a "final decision of the Secretary made after a hearing to which he was a party."[65] In other words, a provider must generally exhaust *564 all four levels of administrative review before seeking judicial review. However, a 42 U.S.C. § 405 collateral-claim exception may apply for claims "(a) that are 'entirely collateral' to a substantive agency decision and (b) for which 'full relief cannot be obtained at a postdeprivation hearing.' "[66] HHS can waive the exhaustion requirement and courts can deem the exhaustion requirement waived "when a plaintiff asserts a collateral challenge that cannot be remedied after the exhaustion of administrative review."[67]
In a similar case, Family Rehab., Inc. v. Azar , the Fifth Circuit held the district court had jurisdiction over Family Rehabilitation, Inc. ("Family Rehab")'s procedural due process and ultra vires claims under the collateral-claim exception to the Medicare Act's administrative exhaustion requirement.[68] Family Rehab identified the crux of a collateral claim: "[i]f the court must examine the merits of the underlying dispute, delve into the statute and regulations, or make independent judgments as to plaintiffs' eligibility under a statute, the claim is not collateral."[69] Ultimately, the Fifth Circuit determined Family Rehab's procedural due process and ultra vires claims satisfied the collateral-claim exception's "entirely collateral" element because Family Rehab sought only suspension of recoupment until a hearing and raised claims unrelated to the merits of recoupment.[70] The Fifth Circuit also held the "full relief" element was satisfied because Family Rehab had " 'raised at least a colorable claim' that erroneous recoupment will 'damage [it] in a way not recompensable through retroactive payments.' "[71]
i. Ultra vires and procedural due process claims
The Court notes Plaintiff's complaint strikingly resembles Family Rehab's original complaint save the substantive due process claim - the majority of Plaintiff's pleadings read nearly word for word Family Rehab's original pleadings.[72] The Fifth Circuit has already determined procedural due process and ultra vires claims nearly mirroring Plaintiff's procedural due process and ultra vires claims meet the collateral-claim exception under the Medicare Act's administrative exhaustion requirement.[73] Regardless, the Court continues with its independent analysis.
The Court finds that, like Family Rehab, Plaintiff's procedural due process and ultra vires claims are collateral. Plaintiff requests *565 the Court suspend recoupment until it receives a hearing.[74] Plaintiff "does not request this Court to resolve the merits of the Medicare claim disputes."[75] Rather, Plaintiff claims a Fifth and Fourteenth Amendment due process violation. Plaintiff further asserts any recoupment prior to the ALJ hearing would be an ultra vires act.[76]
Plaintiff's procedural due process and ultra vires claims do not require the Court to sift through statute and regulations or determine Plaintiff's eligibility under the statutes. Plaintiff's procedural due process and ultra vires claims only require the Court to assess how much due process is required before recoupment and once the recoupment process has started. Hence, the Court considers Plaintiff's procedural due process and ultra vires claims entirely collateral to a substantive agency decision. Moreover, the Court finds Plaintiff has also raised at least colorable procedural due process and ultra vires claims. In turn, Plaintiff has met its burden to show the Court has jurisdiction over Plaintiff's procedural due process and ultra vires claims under the collateral-claim exception to the Medicare Act's administrative exhaustion requirement.
ii. APA claim
Plaintiff does not affirmatively assert jurisdiction under the APA or any statute to bring its APA claim. However, Plaintiff "raises" an APA claim by merely restating, and inconsistently citing, a provision of the APA to "preserve its status of rights" without including verbiage demonstrating the provision's relevance or connection to Plaintiff's claim.[77] Defendants maintain the APA does not serve as an independent grant of subject matter jurisdiction.[78] The Court finds APA jurisdiction is not available here.
The APA provides for judicial review of a "final agency action for which there is no other adequate remedy in a court.[79] Under the APA, a court lacks subject matter jurisdiction to review an action of an administrative agency that is not a "final agency action."[80] Further, even when a court has jurisdiction over a suit to enjoin the Secretary from recouping overpaid Medicare reimbursements, a lack of a "final agency action" is fatal to a court's jurisdiction.[81] The Fifth Circuit has held a court could not exercise such jurisdiction where a Medicare-service provider failed to avail itself of available administrative procedure.[82] Finally, as recognized by the Supreme Court and the Fifth Circuit, the APA does not provide a mechanism to override § 405(h)'s jurisdictional requirements and does not authorize district courts subject matter jurisdiction to issue Medicare suit injunctions.[83]
*566 By nature, Plaintiff's APA claim is not collateral because it requires the Court to delve into the statute and regulations, and to make independent judgments as to Plaintiff's eligibility under the statute. The provision cited relates to Plaintiff's eligibility and status under the statute by Plaintiff's "preservation of status" and assertion of rights under the APA. It should be noted the Fifth Circuit in Family Rehab did not consider Family Rehab's APA claim because Family Rehab conceded its APA claim was not collateral.[84] Finally, since jurisdiction and an adequate remedy under § 405(g) exists for Plaintiff, the Court lacks jurisdiction to review Plaintiff's APA claim.
Notably, even if the Court determined it had jurisdiction over Plaintiff's APA claim, Plaintiff's APA claim lacks the substance necessary for the Court to analyze it either as a cause of action or under a Rule 12(b)(6) standard. Plaintiff fails to demonstrate how its APA claim is within the Court's jurisdiction (and fails to demonstrate any facts specifically relating to its APA claim at all). Plaintiff's claim described as a "preservation of rights" under the APA must be dismissed.
For these reasons, the Court has jurisdiction under the collateral-claim exception over Plaintiff's procedural due process and ultra vires claims, but not Plaintiff's APA claim. Since the Court concludes § 405(g) provides subject matter jurisdiction over Plaintiff's procedural due process and ultra vires claims, the Court need not consider Plaintiff's other assertions of jurisdiction. As such, the Court GRANTS IN PART Defendants' motion to dismiss for lack of subject matter jurisdiction and DISMISSES WITHOUT PREJUDICE Plaintiff's APA claim. The Court now addresses the substance of Plaintiff's procedural due process and ultra vires claims.
C. Rule 12(b)(6) Motion to Dismiss
a. Legal Standard
To survive a Rule 12(b)(6) motion, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[85] This does not require detailed factual allegations, but it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[86] Courts first disregard from their analysis any conclusory allegations as not entitled to the assumption of truth,[87] and then undertake the "context-specific" task of determining whether the remaining well-pled allegations give rise to an entitlement of relief to an extent that is plausible, rather than merely possible or conceivable.[88] Courts regard all such well-pled facts as true and view them in the light most favorable to the plaintiff.[89] Finally, the Court notes, the standards for a Rule 12(b)(6) motion to dismiss and the first element of injunctive relief - that plaintiff has a substantial likelihood of success on the merits - essentially overlap and operate to reach the same conclusion.
b. Analysis
i. Ultra vires claim
Jurisdiction governs judicial authority but guarantees no judicial favor.
*567 Specifically, the Court's jurisdiction over Plaintiff's ultra vires claim cannot remedy Plaintiff's weak pleadings. As noted above, Plaintiff alleges recoupment prior to the ALJ hearing would be an ultra vires act.[90] Plaintiff claims "the ultra vires acts that Plaintiff is contending are not limited to Defendants' failure to provide an ALJ hearing within the allotted time frame ... the unabetted backlog at the OMHA and the premature recoupment infringe upon Plaintiff's due process rights. Since Defendants' recoupment goes beyond the Constitutional limits, their actions constitute ultra vires acts."[91]
Plaintiff asserts conclusory statements and fails to include basic facts supporting its ultra vires claims. The Court need not accept these conclusory allegations devoid of fact.[92] Moreover, as already determined by Family Rehab , Plaintiff's backlog argument falls outside the Court's jurisdiction.[93] Ultimately, Plaintiff insufficiently pleads its ultra vires claim for the Court's analysis according to a Rule 12(b)(6) standard. Thus, Plaintiff's ultra vires claim is not a cause of action and is DISMISSED WITHOUT PREJUDICE . The Court now only addresses Plaintiff's due process claim.
ii. Procedural due process claim
Plaintiff claims the Medicare administrative appeals process violates its Fifth and Fourteenth Amendment rights because it authorizes recoupment prior to a full evidentiary hearing before an ALJ. In particular, Plaintiff argues,
[T]he MAC and ZPIC ... have an established history of overstating overpayments and wrongfully denying legitimate Medicare claims ... Defendants are threatening to deprive [Plaintiff] of its property and liberty interests in rightful Medicare payments and its business reputation and goodwill without due process of law ... even though they cannot and will not afford [Plaintiff] an ALJ hearing within the statutorily allotted time frame ... [which] exceed[s] the bounds and limitations of their authority as forth in the Medicare Act and the United States Constitution.[94]
In response, Defendants allege "Plaintiff has failed to demonstrate a constitutional right to an evidentiary hearing before the Secretary may begin recoupment of a Medicare overpayment and failed to support its claim that the Secretary or the CMS Administrator exceeded any statutory authority."[95] The Court ultimately agrees with Defendants.
1. Medicare administrative appeals process
The Court reiterates the Medicare administrative appeals process couching Plaintiff's claim and the relevant procedural due process standard before rendering its analysis. Under HHS, CMS oversees the Medicare program and contracts with government contractors to process and issue post-payment reimbursements for Medicare-reimbursable services, such as those provided by Plaintiff.[96] Home healthcare providers, like Plaintiff, receive such *568 reimbursements upon performance of home health certifications for each patient pursuant to statutory requirements.[97] After conducting a post-payment audit and identifying overpayment of reimbursements, a ZPIC notifies the relevant MAC, who then sends a demand letter to the provider regarding the overpayment. If HHS does not receive timely (immediate) repayment, HHS will withhold Medicare reimbursements from the provider to recoup the overpayment. A Medicare-reimbursable service provider may appeal the overpayment decision through a "Byzantine" four-level process before requesting judicial review of the Secretary's final decision:
First , [the provider] may submit to the MAC a claim for redetermination of the overpayment. 42 U.S.C. § 1395ff(a)(3)(A).
Second , [the provider] may ask for reconsideration from a [QIC] hired by CMS for that purpose. Id. § 1395ff(c), (g) ; 42 C.F.R. § 405.904(a)(2). If the QIC affirms the MAC's determination, the MAC may begin recouping the overpayment by garnishing future reimbursements otherwise due the provider. 42 U.S.C. § 1395ddd(f)(2) ; 42 C.F.R. § 405.371(a)(3).
Third , the provider may request de novo review before an ALJ within the Office of Medicare Hearings and Appeals (OMHA), an agency independent of CMS. 42 U.S.C. § 1395ff(d) ; 42 C.F.R. § 405.1000(d). The ALJ stage presents the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact. 42 C.F.R. § 405.1036(c) - (d). The ALJ "shall conduct and conclude a hearing ... and render a decision ... not later than" 90 days after a timely request. 42 U.S.C. § 1395ff(d)(1)(A).
Fourth , the provider may appeal to the Medicare Appeals Council ("Council"), an organization independent of both CMS and OMHA. 42 C.F.R. § 405.1100. The Council reviews the ALJ's decision de novo and is similarly required to issue a final decision within 90 days. Id. Furthermore, if the ALJ fails to issue a decision within 90 days, the provider may "escalate" the appeal to the Council, which will review the QIC's reconsideration. Id.[98]
The Council's decision constitutes the Secretary's "final decision."[99] "Fifth, if all else fails, the provider is entitled to 'judicial review of the Secretary's final decision ... as is provided in section 405(g) of this title.' "[100] As such, jurisdiction over a provider's claim vests with federal courts once the Council renders a final decision of claims "arising under" the Medicare Act or the Council fails to act within the one hundred eighty day period.[101] Thus, providers cannot seek judicial review until after exhausting all four levels of the Medicare administrative appeals process or after the provider's escalation attempt proves unsuccessful by the Council's nonresponse. However, the Supreme Court and the Fifth Circuit have recognized jurisdiction exceptions, discussed above, which give providers an opportunity to obtain limited *569 judicial review before expiring all four levels of the Medicare administrative appeals process.[102]
Importantly, recoupment upon completion of the first and second appeal levels is not statutorily prohibited.[103] In other words, HHS may recoup overpayments from a provider's ongoing reimbursement before a provider receives its requested ALJ hearing or a post-escalation Council decision. While repayment of a Medicare overpayment becomes immediately due upon notice, a provider may be eligible for an ERS at the Secretary's conditional discretion:
If the repayment, within 30 days by a provider of services or supplier, of an overpayment under this subchapter would constitute a hardship (as described in subparagraph (B) ), subject to subparagraph (C), upon request of the provider of services or supplier the Secretary shall enter into a plan with the provider of services or supplier for the repayment (through offset or otherwise) of such overpayment over a period of at least 6 months but not longer than 3 years (or not longer than 5 years in the case of extreme hardship, as determined by the Secretary). Interest shall accrue on the balance through the period of repayment. Such plan shall meet terms and conditions determined to be appropriate by the Secretary.[104]
An ERS shall not be provided where "the Secretary has reason to suspect that the provider of services or supplier may file for bankruptcy or otherwise cease to do business or discontinue participation in the program under this subchapter; or there is an indication of fraud or abuse committed against the program."[105] Moreover, if a provider qualifies for an ERS, but fails to make a payment under its ERS, the Secretary has the authority to immediately offset or collect the ERS's total outstanding balance including applicable interest.[106]
Again, the Secretary may begin its recoupment before a provider receives an ALJ hearing. Yet, the Fifth Circuit recognized in March 2018 the current ALJ backlog prevents providers in Plaintiff's situation from obtaining an ALJ hearing for at least three to five years.[107] Finally, should the provider prevail in overturning a denial or revocation in the appeals process, "unpaid claims for services furnished during the overturned period may be resubmitted."[108] In other words, prevailing providers receive full retroactive payments.
2. Legal standard
Generally, "an essential principle of due process is that a deprivation of *570 life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' "[109] A procedural due process claim requires a "familiar two-part inquiry" of courts to determine "whether [plaintiff] was deprived of a protected interest, and if so, what process was [plaintiff] due."[110] In sum, "the essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it' ... 'at a meaningful time and in a meaningful manner' ... [and] that the procedures be tailored ... to 'the capacities and circumstances of those who are to be heard' to ensure they are given a meaningful opportunity to present their case."[111] Further, "procedural due process is not invoked by every governmental action which adversely affects private interests; rather, due process safeguards apply only when a person is deprived of life, liberty or property without due process of law."[112]
The Supreme Court in Mathews v. Eldridge provided a roadmap for considering the sufficiency of due process through the administrative process via three distinct factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[113]
This case demands the Eldridge procedural due process analysis to assess whether Plaintiff has set out a due process violation. In order to do so, the Court must untangle Plaintiff's complaint.
3. Analysis
From Plaintiff's complaint, the Court deciphers two arguments: that Plaintiff did not receive a "fair and impartial" hearing, and that procedural due process requires Plaintiff receive an evidentiary hearing.[114] In other words, Plaintiff alleges it did not receive a hearing before an adjudicator "independent of CMS"[115] before recoupment started, and since the process of recouping alleged overpayments has started, it requires an "evidentiary *571 hearing within the statutorily provided 90 days."[116] Plaintiff's arguments for its procedural due process claim rely on Plaintiff having a protected interest at stake. Thus, before addressing whether Plaintiff has received due process, the Court analyzes step one of the two-part procedural due process inquiry: does Plaintiff have a protected property interest?
a. Plaintiff's protected property interest
Neither party specifically addresses the property interest at stake here. The parties only address the issue of what process is due. Since the Court is considering a motion to dismiss, the Court looks to Plaintiff's complaint to identify its property interest that allegedly gives rise to a due process violation. If Plaintiff has no property interest, there can be no due process violation. Plaintiff asserts in its complaint that it has a property interest in "its rightful Medicare payments."[117] Yet, it is clear from both Plaintiff's complaint and its response that Plaintiff actually asserts a property interest in the recoupment or forestalling of the recoupment. Defendants appear to interpret Plaintiff's complaint to allege as much for Defendants contend that Plaintiff does not have a property interest in an oral pre-recoupment hearing.[118] Regardless of how stated, the Court finds Plaintiff does not have a protected property interest to warrant a procedural due process claim.
"A property interest must be secured by statute, legal rule or through a mutually explicit understanding between government and individual."[119] Over thirty years ago, in Smith v. N. Louisiana Med. Review Ass'n , the Fifth Circuit provided helpful guidance for the instant case:
The United States has assumed no blanket responsibility to compensate physicians or hospitals for services they render to patients. Instead, the government has assumed the obligation to compensate providers of the medical service to the extent those services are covered by the Act ... a provider has no reasonable expectation or entitlement to be paid on a bad claim, that is a claim not covered under the Act.[120]
A year before the Fifth Circuit's Smith decision, the Southern District of Texas ruled that "hospitals have no vested property interest in retaining [ ] overpayments."[121] In reaching its analysis of a hospital's lack of property interest, the Southern District of Texas cited Second Circuit precedent recognizing "providers have no due process right to compensation for amounts recouped as a result of a reduced reimbursement rate since the amounts thus recouped constitute a recovery of overpayments."[122] Moreover, the Northern District of Texas, ironically the district where Family Rehab originates, has noted home health care agencies who have received overpayments "are not entitled to retain such overpayments, for they have no property interest in Medicare *572 overpayments."[123] The court in Greater Dallas Home Care added, "even if the Court were to find that [home health care agencies] have a property interest in the Medicare payment, it does not follow that [home health care agencies] have a property interest in a level of benefits that is greater than Congress has provided."[124]
Most recently, in Personal Care Products, Inc. v. Hawkins , the Fifth Circuit affirmed a district court's finding that a Medicaid medical supply provider had no protected property interest in the payment of its Medicaid claims.[125] Specifically, the district court held "there is no protected property interest in Medicaid payments that are withheld pending an investigation."[126] Accordingly, the district court dismissed the supply provider's remaining claims.[127] The Fifth Circuit concluded, "[f]ederal law does not prohibit these payment holds ... [t]he statutory scheme does not give [the Medicaid medical supply provider] a property interest in its present reimbursement claims while past claims are under investigation for fraud."[128] Ultimately, Personal Care Products presented an opportunity for the Fifth Circuit to explicitly address a Medicaid participant's protected property interest in reimbursement claims while under investigation.[129]
A due process claim fails when there is no property interest. Here, Plaintiff's claim and related arguments fail because they are based on the existence of a property interest Plaintiff does not have. Plaintiff's participation in the Medicare program and related appeals process does not equate to having a property interest in its reimbursement claims. Considering Plaintiff also awaits subsequent investigation of its Medicare appeals claims, Plaintiff has no more property interest than former providers bringing similar claims. Moreover, without going into the merits of Plaintiff's appeals claims, the Court aligns with Fifth Circuit precedent to find Plaintiff has no reasonable expectation or entitlement to be paid on a "bad claim" resulting in recoupment of Plaintiff's reimbursements or otherwise denied claim for reimbursement. Plaintiff is not entitled to hang onto property to which Plaintiff was never entitled. Clearly, the courts that have addressed the issue support this Court's finding that Plaintiff has no protected property interest in the reimbursements. As such, Plaintiff fails to meet the *573 first part of the procedural due process claim. The non-existence of a property interest requires dismissal of Plaintiff's claim. The Court could end its analysis here because Plaintiff's claim cannot survive without a valid property interest. Nevertheless, the Court turns to the second part of the procedural due process two-part inquiry: what process was Plaintiff due?
b. Plaintiff's progress through the administrative process
Before addressing the Eldridge factors, the Court briefly sets out Plaintiff's progress through the Medicare administrative appeals process.[130]
First, per standard practice, in August 2016 a ZPIC requested Plaintiff's records "to initiate a review of Medicare reimbursements for skilled nursing, home health services, physical therapy, occupational therapy, and speech therapy serviced rendered by [Plaintiff]."[131] The ZPIC reviewed a forty-eight claim sample of services provided by Plaintiff from July 19, 2013 to May 10, 2016.[132] With this claim sample, the ZPIC ultimately determined the extrapolated overpayment Medicare made to Plaintiff amounted to $3,573,595.61.[133] In February 2017, Plaintiff received notice that the ZPIC denied 75% of Plaintiff's forty-eight claims.[134] Given the complexity of Plaintiff's process and the procedures involved, the Court details each communication exchanged between the parties as provided in the record.
After being notified by the ZPIC, the MAC sent Plaintiff a demand letter on February 28, 2017, notifying Plaintiff of the reimbursement overpayment and requesting a refund from Plaintiff.[135] In this letter, the MAC informed Plaintiff of a provider's ability to proceed through the rebuttal or appeals process and the respective deadlines and requirements.[136] Moreover, the MAC notified Plaintiff of the appropriate steps and "timeframes to stop recoupment" by appealing the recoupment decision via the formal Medicare administrative appeals process.[137] Should Plaintiff decide to proceed through the Medicare administrative appeals process, the MAC stated, "Medicare will permit providers to stop recoupment at two points ... the *574 first occurs if we receive a valid and timely request for redetermination within 30 days from the date of this letter ... [and the second occurs] if, following an unfavorable or partially favorable redetermination decision if [sic] [Plaintiff] decide[s] to act quickly and file a valid request for reconsideration with the [QIC]."[138] Importantly, the MAC incorporated a section titled in bold "What Happens following a reconsideration by a [QIC] " to explain to Plaintiff that following a QIC decision or dismissal, recoupment would resume "whether or not [Plaintiff] appeal[s] to the next level of Administrative Law Judge."[139] Finally, the MAC noted the possibility of Medicaid offset: "If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped."[140] Plaintiff did not submit a rebuttal statement or request an ERS.[141]
In accordance with the appeals process deadlines provided in the MAC's February 28, 2017 demand letter, Plaintiff submitted multiple separate Redetermination Requests of the denial claims from March to April 2017.[142] In other words, Plaintiff initially appealed its forty-eight denied claims individually, rather than collectively, when it submitted its claims to the MAC for redetermination at the first level of the Medicare administrative appeals process. Thus, Plaintiff received notices regarding its individual claims at different times, described below. These template notices contained updated debt calculations and repetitive language pertaining to the rebuttal process, appeals process, and available repayment options.
Throughout May and July 2017, Plaintiff received multiple Redetermination Decisions and Corrected Redetermination Decisions with some partially upholding the overpayment determination.[143] According to Donna Salais ("Ms. Salais"), the MAC's Accounting Manager, "[Plaintiff's] multiple requests for redeterminations delayed the recalculation of the overpayment until the final decision was issued."[144] Ms. Salais also noted the MAC received information that Plaintiff had filed a request for reconsideration of at least one of the individual claims with the QIC on August 7, 2017, thus staying any recoupment during the appeal's pendency.[145]
Meanwhile, as part of the wave of notices for Plaintiff's individual claims following the MAC's decision, Plaintiff received a second demand letter from the MAC on August 10, 2017, stating the July 14, 2017 Medicare redetermination decision resulted in a recalculated overpayment amount lowered to $3,329,156.43 not including interest.[146] This letter also contained information regarding the rebuttal and appeals processes.[147] Moreover, another recalculation of the overpayment initially decided by the MAC became necessary after the QIC issued favorable reconsideration decisions on two individual claims already reviewed *575 by the MAC on October 4, 2017.[148]
Seemingly aware of the inefficiency of individually appealing its claims, Plaintiff submitted its Reconsideration Request on November 3, 2017, requesting the QIC to consolidate Plaintiff's claims and issue a singular Reconsideration Decision.[149] The QIC received Plaintiff's Reconsideration Request on November 6, 2017.[150] The record reflects some of Plaintiff's claims decided by the MAC required recalculation of the overall amount even though Plaintiff had already sent its reconsideration request to the QIC, who had not yet reached a decision. Thus, before receiving the QIC's decision, Plaintiff still received notices from the MAC regarding the individual claims. For example, on November 8, 2017, Plaintiff received a revised demand letter from the MAC stating its October 4, 2017 reconsideration decision, which presumably regarded a claim preceding the claim consolidation, resulted in a recalculated overpayment of $3,302,481.43 excluding interest.[151] As in previous demand letters, the MAC reiterated the rebuttal and appeals processes.[152] The MAC informed Plaintiff "[r]ecoupment will begin or resume regardless of the filing for an ALJ hearing 30 days from the date of this letter."[153]
Yet, Plaintiff's consolidation request apparently failed to consider all its claims. Plaintiff filed another Reconsideration Request with the QIC regarding additional claims on November 13, 2017.[154] Thus, recoupment stayed during the appeal.[155]
Finally, on May 31, 2018, Plaintiff received the QIC's Reconsideration Decision.[156] The thirty-six-page decision detailed the QIC's findings.[157] After evaluating over thirty "Key Records" in Plaintiff's case file, the QIC concluded:
The decision of the QIC is partially favorable. The QIC finds that some of the [home health] services at issue do meet the requirements to be considered reasonable and necessary. For the services determined to be unfavorable, the QIC finds that an overpayment still exists and the provider is responsible to return the overpaid amount. The QIC was able to replicate the sample and overpayment amount. The QIC has determined that the sample is valid and the extrapolated overpayment is reasonable.[158]
Importantly, the QIC noted that, in the event Plaintiff appealed, the ALJ "will not consider new evidence unless [Plaintiff] show[s] good cause for not presenting the evidence to the QIC."[159] The QIC ended its decision with a page dedicated to providing "Important Information About [Plaintiff's] Appeal Rights."[160] The QIC's partially favorable reconsideration decision again required a recalculation of the overpayment.[161]
On June 25, 2018, four days before filing *576 its complaint,[162] Plaintiff submitted its ALJ hearing request "to challenge each of the individual claim denials as well as the statistical methodology employed by [the QIC and MAC]."[163] Meanwhile, on July 9, 2018, Plaintiff received another revised demand letter where the MAC detailed the QIC's reconsideration decision resulting in a lower recalculated overpayment of $2,704,165.10 exclusive of interest.[164] Still, the MAC noticed Plaintiff it could begin recoupment "no earlier than 30 days after the date of this Revised Demand Letter."[165] The MAC again provided Plaintiff information for the rebuttal and appeals process.[166] This time, the MAC informed Plaintiff "[r]ecoupment will begin or resume regardless of the filing for an ALJ hearing 30 days from the date of this letter."[167]
Following the July 9, 2018 letter, Ms. Salais discovered two unincluded favorable decisions in the overpayment calculation.[168] Thus, on July 19, 2018, a request for recalculation was submitted to the ZPIC, which temporarily ceased recoupment.[169] On July 30, 2018, the MAC sent Plaintiff an additional Revised Demand Letter reducing the recalculated overpayment amount to $2,416,157.10 exclusive of interest.[170] As included in previous demand letters, the MAC gave Plaintiff the same information regarding the rebuttal and applicable appeals processes.[171]
In response, Plaintiff requested a 300-month ERS.[172] On August 8, 2018, a MAC accountant notified Plaintiff via email correspondence it could not approve an ERS request over 60-months, citing the statute providing for an ERS.[173] The MAC accountant provided a list of necessary documentation for an ERS to be considered.[174] The record does not reflect Plaintiff ever submitted an ERS request or necessary documentation in accordance with the statutory requirements.
On September 4, 2018, the MAC issued a letter notifying Plaintiff of the MAC's intent to refer the overpayment to the Department of Treasury's Debt Collection Center for collection and to instruct the State Medicaid Agency to withhold the federal share of Medicaid payments.[175] The September 4, 2018 letter contained a "Due Process" paragraph:
You have the right to request an opportunity to inspect and copy records relating to the debt. This request must be submitted in writing to the address below. You have a right to present evidence that all or part of your debt is not past due or legally enforceable. In order to exercise this right, this office must receive a copy of the evidence to support your position, along with a copy of this *577 letter. You must submit any evidence that the debt is not owed or legally enforceable within 60 calendar days of the date of this letter. If, after sixty (60) calendar days from the date of this letter, we have not received such evidence, your debt, if it is still outstanding and eligible for referral, shall be referred to the Department of Treasury or its designated DCC for cross servicing/offset.[176]
Despite the foregoing, Plaintiff argues "[i]n order to satisfy the due process requirements, the HHS is statutorily required to provide the provider an administrative hearing and an opportunity to challenge the alleged overpayment before a fair and impartial adjudicator. These due process safeguards should be afforded to [Plaintiff] prior to the Defendants imposing a devastating and draconian recoupment that would effectively demolish [Plaintiff]'s business."[177] Defendants maintain Plaintiff "has had multiple opportunities to be heard: (1) the opportunity to rebut the recoupment upon initial notice; (2) redetermination review by the contractor; and (3) reconsideration review by a [QIC] ... [and] the opportunity to craft arguments and present evidence (including declarations, expert reports etc.) to support its positions."[178]
The Court now evaluates the sufficiency of the process provided to Plaintiff by considering the three Eldridge factors: Plaintiff's private interest, the erroneous deprivation of Plaintiff's private interest, and the Government's interest.[179]
c. Eldridge factors
The Court identifies Plaintiff's private interest in this case as an interest in postponing the recoupment of the reimbursements. According to Plaintiff, postponement of the recoupment is necessary to remain in business, to preserve its goodwill and business reputation, and to continue service to its patients. Yet, recoupment need not interrupt service to Plaintiff's patients. Plaintiff's patients are not required to be treated by Plaintiff and may be treated by other providers. The Court recognizes Defendants' provided Declaration of Jacquelyn Smith, a CMS Health Insurance Specialist, which explains "there are six hundred ninety-six (696) other active home health agencies in the service area identified by [Plaintiff] ... there are an adequate number of home health agencies that could provide home health services to the Medicare beneficiaries served by [Plaintiff]."[180] The Court agrees. Thus, it is only Plaintiff's business at stake here. While the Court does not minimize the potential loss to Plaintiff, the Court notes that even Plaintiff's employees can obtain other employment if Plaintiff's business suffers.
In an attempt to avoid the outcome in Eldridge , Plaintiff argues a distinction of little consequence.[181] More specifically, Plaintiff notes that the disability recipient in Eldridge would receive an evidentiary hearing within a year; whereas Plaintiff did not receive its hearing within the statutorily mandated ninety days.[182] This distinction has little consequence because the Supreme Court did not base its decision on *578 the fact that the worker would receive an evidentiary hearing within a year, and in fact, noted that "the delay between the actual cutoff of benefits and final decision after a hearing exceed[ed] one year."[183] The Court notes a further distinction-- the effect of the loss of an income stream to an individual is quite different from the loss of some income to a corporate entity. Eldridge compared a welfare recipient's financial need and a disabled worker's access to private resources and government assistance.[184] In contrast to a disabled worker, who does not enter the workforce anticipating eligibility for disability benefits, Plaintiff pursued eligibility with the Medicare program. From its inception as a Medicare provider, Plaintiff understood its eligibility requirements and its potential reimbursement recoupment should Plaintiff improperly bill for the services it provided to patients. Therein lies the foundation of Plaintiff and Defendants' business agreement.
Second, the Court considers the risk of an erroneous deprivation and the probable value of additional safeguards. Plaintiff concentrates on statistical evidence of reversal at the different stages of the review process. However, as the Supreme Court noted in Eldridge , "[b]are statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process."[185] While Plaintiff does slightly more by specially setting out the reversals in its appeal; as in Eldridge , the Court finds such is not controlling in this case. Rather, the Court considers that Plaintiff is not being deprived of payments properly billed, but rather, is returning monies to which it was never entitled. Plaintiff was given multiple opportunities to contest the amount and, in fact, has succeeded in reducing the amount already.
Furthermore, Plaintiff simply asserts "an administrative hearing and an opportunity to challenge the alleged overpayment before a fair and impartial adjudicator" as due process safeguards.[186] Yet, Plaintiff fails to identify or proffer additional or substitute procedural safeguards and fails to argue the probable value of them. As the Court already mentioned, due process safeguards are embedded by statute in the Medicare administrative appeals process. The Court is not unmindful of the potential impact on Plaintiff's business that recoupment may have. However, Plaintiff, as a business, has more opportunities to find other sources of income than the disability recipient in Eldridge .
Third, the Court evaluates the Government's interest and fiscal and administrative burdens. The Court finds the Government's interest outweighs Plaintiff's interest because the Government's interest advances the public interest here. The Government's interest roots itself in traditional notions of public concern and cooperation. The Government's function and purpose revolve around its Medicare providers serving patients according to their respective needs and billing those services accordingly and accurately, lest the Government discover a provider's fraud, waste, or abuse.[187] Specifically, the Court's focus is "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary *579 hearing upon demand in all cases."[188] The Court recognizes the need for continuing service for actual recipients and Plaintiff's role in providing that service. Yet, Plaintiff, limited by its status as a provider, is only entitled to receive what Medicare covers. The Government's interest - and the Court's focus - remains on the Medicare recipient.
Finally, Plaintiff asserts it is "not requesting this Court to usurp the power of the ALJ, HHS, or CMS to decide the underlying Medicare claims or to review the Redetermination and Reconsideration decisions." However, Plaintiff's claim for relief is neither plausible nor consistent with its request. Circumventing the Medicare administrative appeals process constitutes a usurpation of power and placement of more burden on the administrative players with authority to approach the behemoth backlog and restructure the process. For the Court to impose a separate path to an evidentiary hearing at Plaintiff's procedural stage would open the floodgates for other similarly situated providers floating beneath the ALJ levy walls - and consequentially cause a deluge of costly repair. The Court has no interest in leaving itself and other courts vulnerable to forum shopping and in supplementing an already established, complex statute. Additionally, the Court refuses to partake in aiding the construction of a provider's Trojan horse.
Overall, Plaintiff fails to meet its burden and the Court will not carry Plaintiff's burden for it. Therefore, Plaintiff fails to state a claim. The Court GRANTS Defendants' motion to dismiss for failure to state a claim, and Plaintiff's procedural due process claim is DISMISSED WITH PREJUDICE.
D. Injunctive Relief
The Court's granting in part of Defendants' motion to dismiss for lack of subject matter jurisdiction and granting of Defendants' motion to dismiss for failure to state a claim moots Plaintiff's request for injunctive relief and a hearing because no claims remain for injunctive relief. Nevertheless, the Court notes injunctive relief requires the movant to establish, among other things, there is a substantial likelihood they will prevail on the merits.[189] Courts have utilized the Eldridge factors in determining a provider's substantial likelihood of prevailing on the merits in this type of case.[190] In turn, the Court finds its analysis of Defendants' motion to dismiss for failure to state a claim sufficient to show there is no substantial likelihood Plaintiff will prevail on the merits. Finally, because Plaintiff states no viable cause of action, injunctive relief is unwarranted here. Thus, Plaintiff's requests and motions relating to injunctive relief are DENIED .
III. HOLDING
The Court evaluated Plaintiff's claims as pled because Plaintiff's request for amendment was without merit. Because the Court dismissed without prejudice Plaintiff's APA claim for lack of subject matter jurisdiction; dismissed without prejudice Plaintiff's ultra vires claim for failure to state a claim; and dismissed with prejudice Plaintiff's procedural due process claim for failure to state a claim, the Court GRANTS Defendants' motion to dismiss.[191]
*580 Thus, the Court concludes Plaintiff fails to state a claim, and as a result, fails to state a claim warranting injunctive relief. As such, the Court DENIES Plaintiff's motion for preliminary injunction,[192] DENIES Plaintiff's emergency motion and application for TRO and injunctive relief,[193] DENIES Plaintiff opposed motion for expedited hearing,[194] and DENIES Plaintiff's amended and corrected motions for preliminary injunction.[195] Plaintiff has no remaining claims before the Court. For these reasons, the Court DISMISSES as set forth herein Plaintiff's action.[196] Pursuant to Rule 58, a final judgment will issue separately.
IT IS SO ORDERED.

Dkt. No. 20.

Dkt. No. 23.

Dkt. No. 30.

Dkt. No. 13 (where Plaintiff seeks an order for a hearing "for Plaintiff's application for Preliminary Injunction" rather than an order granting a preliminary injunction).

Dkt. No. 16.

Dkt. No. 17.

Dkt. No. 18.

Dkt. No. 24.

Dkt. Nos. 32 & 33. Dkt. No. 33 is a duplicate of Dkt. No. 32 but with a referenced exhibit attached.

Dkt. No. 1.

Dkt. No. 1 p. 15, ¶ 61; Dkt. No. 3 p. 14.

The amount of recoupment reduced from approximately $3.6 million to $2.4 million. Dkt. Nos. 16-1, 17-4, 17-8.

Dkt. No. 1 p. 18, ¶ 72; Dkt. No. 3 p. 1.

Dkt. No. 20 pp. 6-16; see Dkt. No. 21 p. 2, ¶ 6.

Dkt. No. 20 pp. 16-24.

See Dkt. No. 10.

Dkt. No. 1 pp. 5-6, ¶ 15.

Id. at p. 15, ¶ 60.

Dkt. No. 17-4 p. 2.

Id.

Dkt. No. 1 p. 13, ¶ 52; Dkt. No. 3 p. 10; Dkt. No. 17-4 p. 2.

Dkt. No. 1 p. 13, ¶ 52; Dkt. No. 3 p. 10. It should be noted the Supreme Court recently granted a petition for certiorari from HHS relating to the D.C. Circuit's striking down of the calculation methodology used for payments to nine hospitals serving a high volume of low-income patients in 2012. See Allina Health Servs. v. Price , 863 F.3d 937 (D.C. Cir. 2017), cert. granted in part sub nom. Azar v. Allina Health Servs. , --- U.S. ----, 139 S.Ct. 51, 201 L.Ed.2d 1129 (2018). However, the Court finds this does not impact the case at hand because the present case does not review the merits of the billing dispute.

Dkt. No. 1 p. 13, ¶ 54; Dkt. No. 3 p. 10; Dkt. No. 17-4 p. 2.

Dkt. No. 17-4 p. 2.

Dkt. No. 1 pp. 13-14, ¶ 56; Dkt. No. 3 p. 10; Dkt. No. 17-4 p. 2.

Id.

Dkt. No. 1 p. 14, ¶ 57; Dkt. No. 3 p. 10.

Dkt. No. 1 pp. 11-12, ¶¶ 41-48; Dkt. No. 3 pp. 7-9.

Dkt. No. 1.

Dkt. Nos. 2-3.

Dkt. No. 14.

Dkt. No. 10 p. 6 (emphasis added).

See Dkt. Nos. 1-3, 10.

Dkt. No. 10 p. 6.

Id.

Id.

Dkt. No. 13.

Dkt. No. 15.

Dkt. No. 16-1.

See Dkt. Nos. 16-1, 17-8.

Dkt. No. 16 p. 2, ¶ 5.

Id. ; Dkt. No. 16-2; see 42 C.F.R. §§ 401-607(c)(2)(vi).

Dkt. No. 16 pp. 4-5; see Dkt. No. 16-3.

Dkt. No. 17; see Dkt. No. 13.

Dkt. No. 16.

Dkt. Nos. 17 & 18.

Dkt. No. 20.

Dkt. No. 24 p. 3, ¶ 8.

Dkt. No. 23.

Dkt. No. 24.

Dkt. No. 30.

Dkt. No. 32.

Dkt. No. 33.

See Dkt. No. 10 (where the Court noted ninety days had not expired since the time of Plaintiff's hearing request and Plaintiff had not briefed such standing issues).

Dkt. No. 23 p. 10.

Id.

Edionwe v. Bailey , 860 F.3d 287, 294 (5th Cir. 2017), cert. denied , --- U.S. ----, 138 S.Ct. 687, 199 L.Ed.2d 537 (2018) (where appellant's motion to amend stated "[i]f the Court is inclined to dismiss any portion of Plaintiff's complaint for failure to state a claim, Plaintiff requests leave of court to amend his complaint to cure the alleged pleading deficiencies identified by Defendants ....") (citing Gentilello v. Rege , 627 F.3d 540, 546 (5th Cir. 2010) ).

Fed. R. Civ. P. 12(b)(1).

See Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss. , 143 F.3d 1006, 1010 (5th Cir. 1998) (quotation marks and citations omitted).

Ramming v. United States , 281 F.3d 158, 161 (5th Cir. 2001) (quoting Home Builders , 143 F.3d at 1010 ).

Id.

Family Rehab., Inc. v. Azar , 886 F.3d 496, 500 n.4 (5th Cir. 2018) (" 'Although § 405(g) is a provision of the Social Security Act, it has been made applicable to Medicare by 42 U.S.C. § 1395ff(b)(1)(A).' Cf. Shalala v. Ill. Council on Long Term Care, Inc. , 529 U.S. 1, 12-13, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) ; Physician Hosps. of Am. v. Sebelius , 691 F.3d 649, 653 (5th Cir. 2012) (holding that 42 U.S.C. § 1395ii 'makes Section 405(h) applicable to Medicare'). Accordingly, Medicare cases usually are excluded from the general grant of federal-question jurisdiction in 28 U.S.C. § 1331 absent exhaustion of the agency appeals.").

Dkt. No. 1 pp. 6-7, ¶¶ 19, 24.

Id. at pp. 19-20, ¶¶ 81-84.

42 U.S.C. § 405(g).

Family Rehab. , 886 F.3d at 501 (citing Mathews v. Eldridge , 424 U.S. 319, 330-32, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ).

Eldridge , 424 U.S. at 330, 96 S.Ct. 893 ; Family Rehab , 886 F.3d at 501 n.7 (citing Affiliated Prof'l Home Health Care Agency v. Shalala , 164 F.3d 282, 285 (5th Cir. 1999) ) (where the Fifth Circuit noted Family Rehab met the first prong of the collateral-claim exception: "[T]here must have been presentment to the Secretary."). The Court finds Plaintiff has also met this first prong.

Family Rehab. , 886 F.3d at 501-504.

Id. at 503 (citing Heckler v. Ringer , 466 U.S. 602, 614, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) ; Affiliated Prof'l , 164 F.3d at 284-85 ); see Eldridge , 424 U.S. at 330-32, 96 S.Ct. 893 ; see also Bowen v. City of New York , 476 U.S. 467, 473-74, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

Family Rehab. , 886 F.3d at 503.

Id. at 504 (citing Eldridge , 424 U.S. at 331, 96 S.Ct. 893 ).

Compare Dkt. No. 1 with Family Rehab., Inc. v. Hargan , No. 3:17-CV-3008-K, 2017 WL 6761769 (N.D. Tex. Nov. 2, 2017), aff'd in part, rev'd in part sub nom. Family Rehab. , 886 F.3d 496, Dkt. No. 1 (Family Rehab's original complaint).

See Family Rehab. , 886 F.3d at 501.

Dkt. No. 1 p. 7, ¶ 24.

Id.

Id. at pp. 19-20, ¶¶ 81-82.

Id. at pp. 19-20, ¶¶ 81-84. Plaintiff quotes the Administrative Procedure Act, citing 5 U.S.C. § 705, but instead titles its Count Three as a preservation of status of rights under § 704.

Dkt. No. 20 p. 16.

5 U.S.C. § 704.

Veldhoen v. U.S. Coast Guard , 35 F.3d 222 (5th Cir. 1994).

Gallo v. Mathews , 538 F.2d 1148, 1150-51 (5th Cir. 1976).

Id.

See Your Home Visiting Nurse Servs. v. Shalala , 525 U.S. 449, 456-58, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999) ; Heckler , 466 U.S. at 622-23, 104 S.Ct. 2013 ; Faith Home Health Servs., Inc. v. Shalala , 166 F.3d 341 (5th Cir. 1998).

Family Rehab. , 886 F.3d at 501 n.6.

Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ); see In re Katrina Canal Breaches Litig. , 495 F.3d 191, 205 (5th Cir. 2007).

Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly , 550 U.S. at 555, 127 S.Ct. 1955 ).

Iqbal , 556 U.S. at 678-79, 129 S.Ct. 1937.

Id. at 679-80, 129 S.Ct. 1937.

Id.

Dkt. No. 1 p. 19, ¶¶ 77-80; Dkt. No. 3 p. 2.

Dkt. No. 16 p. 3, ¶ 9.

See Iqbal , 556 U.S. at 662, 129 S.Ct. 1937.

See Family Rehab. , 886 F.3d at 504-505 (where the Fifth Circuit discusses a provider's hearing delay resulting from the backlog, but jurisdiction is unavailable under 28 U.S.C. § 1331 ).

Dkt. No. 1 pp. 18-19, ¶¶ 74, 76, 79.

Dkt. No. 20 p. 3.

See 42 U.S.C. § 1395kk-1 ; 42 C.F.R. §§ 405.904(a)(2), 405.920 -405.928.

42 C.F.R. § 424.22.

Family Rehab. , 886 F.3d at 499-500 (emphasis added).

Maxmed Healthcare, Inc. v. Price , 860 F.3d 335, 338 (5th Cir. 2017) (citing 42 C.F.R. § 405.1000(c) ).

Maxmed Healthcare , 860 F.3d at 338 (citing 42 U.S.C. § 1395ff(b)(1)(A) ).

42 U.S.C. § 405(g), (h) ; Family Rehab. , 886 F.3d at 500 n.4.

Family Rehab. , 886 F.3d at 501 (citations omitted) ("Yet both the Supreme Court and this court have recognized exceptions to the channeling requirements of § 405, which Family Rehab now invokes as bases for jurisdiction. First, Family Rehab claims that its procedural due-process and ultra vires claims are collateral to the agency's appellate process, invoking Mathews v. Eldridge . Second, Family Rehab insists that § 405 'would not simply channel review through the agency, but would mean no review at all,' thereby reasoning that jurisdiction is proper under 28 U.S.C. § 1331. Third, Family Rehab maintains that the court has mandamus jurisdiction.").

See Family Rehab., Inc. v. Hargan , No. 3:17-CV-3008-K, 2017 WL 6761769 (providing an example of the government recouping overpayments pending an ALJ hearing).

42 U.S.C. § 1395ddd(f)(1)(A).

See id. § 1395ddd(f)(1)(C).

See id. § 1395ddd(f)(1)(D).

Family Rehab. , 886 F.3d at 500 ; Maxmed Healthcare , 860 F.3d at 344-45.

42 C.F.R. § 424.545(a)(2).

Cleveland Bd. of Educ. v. Loudermill , 470 U.S. 532, 545, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting Mullane v. Cent. Hanover Bank & Tr. Co. , 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ).

Logan v. Zimmerman Brush Co. , 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

Eldridge , 424 U.S. at 348-49, 96 S.Ct. 893 (quoting Joint Anti-Fascist Comm. v. McGrath , 341 U.S. 123, 171-172, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); Armstrong v. Manzo , 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) ; Goldberg v. Kelly , 397 U.S. 254, 268-69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ).

St. Joseph Hosp., a Div. of Sisters of Charity of The Incarnate Word v. Elec. Data Sys. Corp. , 573 F.Supp. 443, 447 (S.D. Tex. 1983) (citing Cervoni v. Secretary of Health, Education and Welfare , 581 F.2d 1010, 1017 (1st Cir.1978) ).

Eldridge , 424 U.S. at 335, 96 S.Ct. 893 ; see Family Rehab., Inc. v. Azar , No. 3:17-CV-3008-K, 2018 WL 2670730, at *2 (N.D. Tex. June 4, 2018) ; see also Adams EMS, Inc. v. Azar , No. CV H-18-1443, 2018 WL 3377787, at *4 (S.D. Tex. July 11, 2018).

Dkt. No. 1 p. 18, ¶¶ 74-75; Dkt. No. 23 p. 9.

Dkt. No. 1 p. 3, ¶ 8; Dkt. No. 3 p. 6.

Dkt. No. 23 p. 9.

Dkt. No. 1 p. 19.

Dkt. No. 20 p. 17 n.12.

St. Joseph Hosp. , 573 F.Supp. at 447 (citing Geriatrics, Inc. v. Harris , 640 F.2d 262, 264 (10th Cir. 1981) ).

Smith v. N. Louisiana Med. Review Ass'n , 735 F.2d 168, 173 (5th Cir. 1984).

St. Joseph Hosp. , 573 F.Supp. at 447.

Id. (emphasis added) (citing Grossman v. Axelrod , 646 F.2d 768, 771 (2d Cir.1981) (where New York Medicaid law did not give providers a property right in prospective reimbursement payments).

Greater Dallas Home Care All. v. United States , 10 F.Supp.2d 638, 646 (N.D. Tex. 1998) (where home health care agencies who were participants of the Medicare program sought a preliminary injunction against the application of the interim payment system reimbursement plan); see Painter v. Shalala , 97 F.3d 1351, 1358 (10th Cir. 1996) ; Whitney v. Heckler , 780 F.2d 963, 972 (11th Cir. 1986).

Greater Dallas Home Care All. , 10 F.Supp.2d at 646 ; see Flemming v. Nestor , 363 U.S. 603, 610-11, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) ; Painter , 97 F.3d at 1358.

Pers. Care Prod., Inc. v. Hawkins , No. A-07-CA-1020 LY, 2009 WL 2406253 (W.D. Tex. Aug. 3, 2009), report and recommendation adopted , No. A-07-CA-1020-LY, 2009 WL 7472394 (W.D. Tex. Aug. 18, 2009), aff'd , 635 F.3d 155 (5th Cir. 2011).

Id. ; see Yorktown Medical Laboratory, Inc. v. Perales , 948 F.2d 84, 89 (2d Cir.1991) ; see also Matter of Guiding Light Corp. , 217 B.R. 493, 498 (Bankr. E.D. La. 1998).

Pers. Care Prod. , No. A-07-CA-1020 LY, 2009 WL 7472394.

Pers. Care Prod. , 635 F.3d at 159.

Pers. Care Prod. , No. A-07-CA-1020 LY, 2009 WL 2406253, at *7 (citing Matter of Guiding Light Corp. , 217 B.R. at 498 ) ("The Fifth Circuit has not directly addressed the question of whether a Medicaid provider has a protected property interest, giving rise to a right to due process, in the payment of a claim for reimbursement.").

It should be noted Plaintiff fails to provide factual detail of its progress through the appeals process in its complaint. Despite Plaintiff's failure, the Court pieced together a timeline through the parties' proffered statements and Defendants' attached exhibits and declarations.

Dkt. No. 1 p. 12, ¶ 49; see Dkt. No. 3 p. 9; see also Dkt. No. 17-4 p. 2.

Dkt. No. 1 p. 13, ¶ 50; Dkt. No. 3 p. 9; Dkt. No. 17-4 p. 2.

Id.

The exact timeline is unclear to the Court. Defendants' Medicare Reconsideration Decision states the ZPIC notified Plaintiff of its review results on February 23, 2017. Dkt. No. 17-4 p. 2. Yet, Plaintiff claims the ZPIC sent its results via a letter dated February 10, 2017. Dkt. No. 1 p. 13, ¶ 50; Dkt. No. 3 p. 9.

Dkt. No. 17-1; Dkt. No. 17-4 p. 2. While the CMS logo spans the top of each of the demand letters, the MAC's information concludes the letters. For consistency purposes, the Court addresses these letters as if sent by the MAC on behalf of CMS. Moreover, the Court notes each letter is unsigned.

Dkt. No. 17-1 pp. 2-3. According to the MAC, "[t]he rebuttal process provides the debtor the opportunity to submit a statement and/or evidence stating why recoupment should not be initiated. The outcome of the rebuttal process could change how or if we recoup ... this is not an appeal of the overpayment determination, and it will not delay recoupment before a rebuttal response has been rendered. The rebuttal statement does not cease recoupment activities ...." Id.

Id. at p. 3.

Id.

Id. at p. 4.

Id.

Dkt. No. 17-6 p. 2, ¶ 6.

Dkt. No. 1 p. 13, ¶ 54; Dkt. No. 3 p. 10; Dkt. No. 17-4 p. 2.

Dkt. No. 17-4 p. 2.

Dkt. No. 17-6 p. 2, ¶ 9.

Id. at p. 3, ¶ 10.

Dkt. No. 17-2.

Id. at p. 2.

Dkt. No. 17-6 p. 3, ¶ 11.

Dkt. No. 1 p. 13, ¶ 56; Dkt. No. 17-4 p. 2.

Dkt. No. 17-4 p. 2.

Dkt. No. 17-3 p. 1.

Id. at p. 2.

Id.

Dkt. No. 17-6 p. 3, ¶ 13.

Id.

Dkt. No. 17-4.

Id.

Id. at pp. 2-3, 34.

Id. at p. 35.

Dkt. No. 17-4 p. 36.

Dkt. No. 17-6 p. 3, ¶ 14.

Dkt. No. 1.

Id. at p. 14, ¶ 57.

Dkt. No. 17-5; Dkt. No. 17-6 p. 3, ¶ 15.

Dkt. No. 17-5 p. 1.

Id. at p. 2.

Id.

Dkt. No. 17-6 p. 3, ¶ 16.

Id.

Dkt. Nos. 16-1, 17-8, 24-1; Dkt. No. 16 p. 2, ¶ 4 (where Plaintiff includes interest in updating the Court on the recoupment calculation).

Dkt. Nos. 16-1, 17-8, 24-1.

Dkt. No. 16 p. 2, ¶ 5.

Dkt. No. 16-2 p. 1; Dkt. No. 24-2 p. 1; see 42 C.F.R. 401-607(c)(2)(vi) ).

Dkt. No. 16-2 p. 1; Dkt. No. 24-2 p. 1.

Dkt. No. 24-4.

Id. at p. 3.

Dkt. No. 1 p. 18, ¶ 75.

Dkt. No. 20 pp. 18-19.

See Eldridge , 424 U.S. at 335, 96 S.Ct. 893.

Dkt. No. 17-1 p. 2, ¶ 4.

Dkt. No. 23 p. 9.

Id.

Eldridge , 424 U.S. at 342, 96 S.Ct. 893.

Id. at 341, 96 S.Ct. 893.

Id.case-ids="12026449" index="182" url="https://cite.case.law/us/424/319/#p330"> at 346, 96 S.Ct. 893.

Dkt. No. 1 p. 18, ¶ 75.

See 42 U.S.C. § 1395ddd(f)(1)(C) (discussing a provider's ineligibility for a repayment plan upon indication of fraud or abuse committed against the program).

Eldridge , 424 U.S. at 347, 96 S.Ct. 893.

City of El Cenizo, Texas v. Texas , 890 F.3d 164, 176 (5th Cir. 2018) (quoting Tex. Med. Providers Performing Abortion Servs. v. Lakey , 667 F.3d 570, 574 (5th Cir. 2012) ).

See Family Rehab., Inc. v. Azar , No. 3:17-CV-3008-K, 2018 WL 2670730 ; Adams EMS, Inc. v. Azar , No. CV H-18-1443, 2018 WL 3377787.

Dkt. No. 20.

Dkt. No. 13.

Dkt. No. 16.

Dkt. No. 24.

Dkt. Nos. 32 & 33.

Dkt. No. 1.